CHRISTINA J., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–14022.

Supreme Court of Alaska.

July 8, 2011.

---

Olena Kalytiak Davis, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

CHRISTEN, Justice.

## I. INTRODUCTION

Christina J. appeals from the termination of her parental rights to her son, Gideon, an Indian child. Christina spent much of her own childhood in OCS custody after being removed from her parents' home due to their substance abuse and domestic violence. She developed substance abuse problems as a young teenager and became involved in an abusive relationship with Gideon's father, Damian, shortly after leaving OCS custody at age 18. Gideon was born when Christina was 19, and was removed from parental custody when he was four months old after OCS received reports of domestic violence by Damian and substance abuse and neglect by both parents. Over the next several months, Christina was convicted of minor consuming alcohol on multiple occasions. She participated in substance abuse, domestic violence, and mental health assessments but did not complete the treatment programs arranged for her pursuant to those assessments. Nine months after taking custody, OCS petitioned for termination of parental rights. The termination trial took place approximately five months later in July 2010. Damian relinquished his parental rights but the superior court made the necessary findings to terminate Christina's parental rights. Christina appeals. We affirm the superior court's termination of Christina's parental rights.

## II. FACTS AND PROCEEDINGS

### A. Christina's Childhood (October 1989 To October 2007)

Appellant Christina J.,[1] was born in Fairbanks and raised in Fort Yukon. OCS[2] removed Christina from her parents' custody in 2001, when she was 11 or 12 years old. Prior to that time, Christina was exposed to alcohol abuse and domestic violence in her parents' home; at one point, her mother attempted suicide. Shortly before she was removed by OCS, Christina's brother committed suicide in the home. These events were a cause of emotional trauma and ongoing grief in Christina's later life. While in OCS custody, Christina initially lived in a foster home in Eielson; she subsequently spent five months at the Residential Diagnostic Treatment Center (RDT), where she was treated for depression and grief, and 30 days at the Presbyterian Hospitality House.

Christina began drinking at age 12. She was convicted of minor consuming alcohol offenses at least twice before she turned 14. Another minor consuming charge immediately after Christina's 14th birthday was dismissed for jurisdictional reasons. Christina spent time in substance abuse treatment at the Adolescent Residential Center for Help (ARCH) (five months) and the McLaughlin Youth Center (approximately two years). Although she completed substance abuse treatment at both facilities, Christina testified that she felt she was placed at McLaughlin because OCS "didn't know what to do with [her], because [she] was leaving foster homes where [she] didn't feel comfortable." Christina left McLaughlin at age 17; she stayed briefly at the Fairbanks Youth Facility and at a foster home, but subsequently left. She did not ask OCS for a different placement because she "didn't want to listen to all their excuses." Christina remained in OCS custody until she turned 18 in 2008. OCS assigned Christina an OCS employee to assist in her transition out of custody, but Christina does not appear to have substantially worked with the employee; Christina testified to being "tired" of working with OCS at the time.

### B. Christina's History Between Age 18 And Gideon's Birth (October 2007 To February 2009)

Christina was still 18 when she met and began dating Damian in Fort Yukon. Damian is approximately ten years older than

---

1. This opinion uses pseudonyms to protect the family's privacy.

2. Christina's contacts with OCS began when it was still known as the Department of Family and Youth Services (DFYS).

Christina and he assaulted Christina from the beginning of the relationship. Christina moved to Venetie to live with Damian in a house he owned there. Damian paid their shared bills.

Damian continued to be abusive after Christina became pregnant with their child, Gideon, in 2008. Christina testified to one incident that occurred when she was five months pregnant and Damian, intoxicated, woke Christina by grabbing her hair and slapping her. The couple traveled to Fairbanks in January 2009 in anticipation of the baby's birth. Two weeks before the birth, Damian came back to their room at a hotel, drunk. Christina knew that Damian became abusive when he was intoxicated and she sought help from the front desk to stop him from entering the room, but Damian punched through the window to get in. Damian was gone by the time the police arrived. He was later convicted of criminal mischief for the incident.

Christina relocated to a different hotel but she allowed Damian to stay with her there. Four days before Gideon's birth, Christina was in her room at the hotel when Damian returned. He was intoxicated. Damian grabbed Christina, punched her in the face, pushed her down, and pulled out a knife. He started to approach Christina but then stopped and said he wanted to stab himself. Christina fled from the room, but Damian caught her, threw her to the ground, and punched her in the face. Damian was later convicted of Fourth Degree Assault and sentenced to jail. Christina testified that she thought being beaten by Damian caused her to go into labor early.

Gideon was born four days later, on February 18, 2009. He tested positive for cocaine at birth, although Christina testified that she was unaware of this fact.

## C. OCS Involvement Prior To Temporary Custody Petition (February 2009 To May 2009)

Christina remained in Fairbanks for several weeks after Gideon was born to get treatment for postnatal medical problems, including postpartum depression, and low blood count requiring a blood transfusion.

Christina and Damian subsequently returned to Venetie and resumed their relationship. Christina testified that "it was going pretty good" during this period, though she also described instances of domestic violence. In April 2009, for example, Damian slapped Christina while she was holding Gideon in her arms, causing her nose to bleed so that some of the blood fell on the baby. On another occasion Damian pushed Christina to the floor, kicking her in the stomach and calling her names.

On April 14, 2009, OCS received a protective service report of domestic violence between Christina and Damian when Gideon was present. Jon Markkanen, an OCS social worker, attempted to locate the couple in Venetie but learned they were in Fairbanks. He met with them there and developed an informal safety plan under which Christina and Damian would live with Karen, Christina's former foster mother, when they were in Fairbanks and with Ronda, Damian's mother, when in Venetie. Markkanen also discussed options for substance abuse and anger management treatment through a therapy program at the Old Minto Recovery Camp (OMRC). Christina and Damian agreed that they needed to get help and were willing to pursue treatment. Christina later testified that she was confused by the plan and was under the impression that they were not allowed to go back to Venetie.

Christina and Damian stayed in Fairbanks with Karen. On April 30, Markkanen heard from Karen that Christina had been out drinking for the past week, leaving Gideon in Karen's care. Karen also reported that Christina had attempted suicide and was in the hospital. Christina was intoxicated at the time of the attempt and later testified that she did not clearly remember the events leading up to it. However, she acknowledged the attempt and noted that she was going through postpartum depression and "didn't understand why [Damian's abuse] was happening to [her]." Soon after being discharged from the hospital, Christina was admitted to the emergency room. While there, emergency room staff observed that she had wounds and bruises from an assault. Christina could not remember who had given

her the bruises, though she seemed to assume, and the trial court concluded, that Damian was responsible.

Markkanen met with Christina on May 11. He had secured a bed for her at Grandma's House, a domestic violence shelter in Fairbanks that is culturally geared toward Alaska Natives[3] and would have allowed Christina to keep Gideon with her. Both Markkanen and the owner of Grandma's House offered Christina a ride to the shelter. Markkanen also discussed substance abuse treatment providers with Christina. Christina declined the offer to go to Grandma's House. She later explained that she did not go because she needed to collect her personal belongings from various places and because a friend was going to take her and Gideon to the Interior Alaska Center for Non–Violent Living shelter. Markkanen testified that Christina said she wanted to go back to Karen's home. It is not entirely clear from the record where Christina went upon leaving the hospital, but it appears that Gideon remained with Karen; Christina may have been staying at the Center for Non–Violent Living.

On May 20, Karen informed OCS that Damian, intoxicated, had taken Gideon from her home and she did not know where they had gone. Christina testified that she later located Damian and Gideon at a hotel. According to the OCS predisposition report, Karen found the entire family at a hotel. Because both parents were intoxicated, she removed Gideon and took him to Tanana Valley Clinic where he was found to be mildly dehydrated.

Two days later, OCS filed a petition to adjudicate Gideon as a child in need of aid and a petition for temporary custody. The petition alleged Gideon to be a child in need of aid under AS 47.10.011(6), (8), (10), and (11).[4] Prior to the hearing on the petition to adjudicate, Markkanen again secured a bed for Christina at Grandma's House and talked to her about the possibility of going there with Gideon, but she refused.

The superior court granted temporary custody to OCS effective June 5, 2009.[5] Gideon was placed in emergency custody in Fairbanks. He was subsequently placed with Damian's mother, Ronda, in Venetie.[6] In early June 2009, the case was transferred to OCS caseworker Ivory McDaniel. An initial case plan for both parents became effective on June 9.

### D. Temporary Custody Petition To Adoption As Sole Goal (June 2009 To November 2009)

On June 19, Christina, who was staying in Fairbanks at the Interior Alaska Center for Non–Violent Living, was arrested for underage drinking after she contacted police to report she had been in a fight. She was convicted of habitual minor consuming alcohol and sentenced to 20 days in jail with 19 days suspended. Christina returned to the Center for Non–Violent Living for a few days, then went to Venetie. Damian was incarcerated for assault at the time (Christina was not the victim) and he remained in Fairbanks. While in Venetie, Christina was allowed to visit Gideon for four hours a day at Ronda's home.

On July 16, Ronda brought Gideon to Fairbanks for a visit with Damian. While she was there, she told McDaniel that she could no longer care for Gideon, in part because Christina was not following the safety plan and Ronda felt unable to intervene. Gideon was placed in an emergency foster home in North Pole. McDaniel did not have a telephone number to reach Christina in Venetie, so she asked Ronda to have Christina contact

---

3. Christina is an Alaska Native.

4. These subsections provide for CINA findings where the child has suffered or is at risk of suffering substantial physical harm; is at risk of mental injury as a result of exposure to domestic violence; is at substantial risk of harm associated with a parent's substance abuse; or is at substantial risk of physical harm or mental injury associated with a parent's mental illness or emotional disturbance. See AS 47.10.011.

5. The initial custody order provided for temporary custody through June 9. The superior court subsequently made its provisional findings nonprovisional and entered an order for temporary custody for 120 days.

6. OCS was unable to license Karen as a foster parent; it is unclear from the record why this was the case.

her. McDaniel also contacted a tribal elder in Venetie and the ICWA worker in Fort Yukon "in hopes that someone could relay the message" to Christina regarding Gideon's new placement. Christina testified that she had left telephone numbers where she could be reached and was not aware that McDaniel had attempted to contact her. Christina left a message for McDaniel a few days later, saying she was having a hard time and complaining that OCS was working harder with Damian than with her. She provided two telephone numbers for McDaniel to return her call, but McDaniel testified that there was no answer at either number when she tried to do so. Christina called again on July 24 and spoke to McDaniel. They discussed the assessments Christina needed to complete.

After missing an in-person substance abuse assessment scheduled by McDaniel, Christina was able to complete a telephonic substance abuse assessment with Shades of Growth on July 24. Christina told the assessor that she started drinking at age thirteen and denied using methamphetamine or cocaine, although she gave contradictory information in subsequent assessments. Christina stated that she did not believe her drinking was a problem, leading the assessor to conclude that she was in the "pre-contemplation stage of change" and at a high risk for relapse. In light of Christina's prior treatment episodes and continued drinking, the assessor recommended that Christina participate in a Level III.3 residential treatment program,[7] as well as a domestic violence awareness class, an Alcoholics Anonymous support group, parenting classes, and GED classes.

When they spoke in late July, Christina and McDaniel also discussed arrangements for Christina to visit Gideon. McDaniel later tried to contact Christina in Venetie to schedule visitation but could not get in touch with her. At around this time, McDaniel was contacted by Christina's birth mother, who said that Christina had been visiting her birth parents in Fort Yukon but had left to

go to Fairbanks. On August 8 McDaniel learned from Damian, who was participating in NorthStar's work release program in Fairbanks, that Christina was in town. Christina later explained that she returned to Fairbanks because she "thought if [she] moved to Fairbanks, it [would] be easier ... to work with OCS," but she claimed that she continued to experience difficulty contacting her caseworker.

On August 17 Christina was convicted of minor consuming alcohol and was incarcerated for approximately 12 days. McDaniel visited Christina in jail and arranged for Gideon to visit her there. McDaniel also arranged for Christina to have a behavioral assessment while incarcerated. Christina told the assessor about the domestic violence she witnessed during her childhood and described Damian's assaults. She stated that she and Damian had been drunk in front of Gideon, though she noted that they tried to take him to a babysitter when they planned to drink. She said she began drinking at age 12, had used crack cocaine on a regular basis before she met Damian, and had tried methamphetamine. The assessor concluded that Christina had "shown that she is unable to keep herself healthy and safe, and it should be considered that she is unable to keep her child safe as well." The assessment recommended that Christina participate in the Changing Patterns program or a similar victim-focused program, as well as individual therapy, an in-patient substance abuse program, and a psychiatric evaluation.

While Christina was incarcerated, McDaniel brought her an application for Dena A Coy, a women's dual treatment mental health and substance abuse facility in Anchorage. Christina agreed to go to Dena A Coy, where she would be able to have Gideon with her after an initial trial period; however, she later testified that she "didn't want to go because [she] didn't think [she would] have a lot of family support down there, and it was away from home." McDaniel arranged for Christina to enter Dena A Coy upon her release from jail and arranged transportation

---

7. As the assessor testified, a Level III.3 treatment is a clinically managed medium-intensity, long-term residential program.

to Anchorage for her. McDaniel urged Christina to return to Venetie during the weekend between her release from jail and her departure for Anchorage and provided a plane ticket for her to do so. But Christina chose to stay in Fairbanks with Karen. Christina left Karen's house the night before she was scheduled to fly to Anchorage and she did not return. McDaniel and another social worker searched for Christina in downtown Fairbanks, but Christina missed her flight. McDaniel contacted staff at Dena A Coy, who reluctantly agreed to hold a bed for Christina for one more day.

Christina called McDaniel later that evening. McDaniel characterized their phone call as "confrontational" and stated that Christina sounded intoxicated. McDaniel told Christina she would reschedule a flight to Anchorage for the following day and Christina should meet her at OCS. The next day, Christina missed her flight again. She was arrested the following day under a downtown bridge for a drinking-related offense. During Christina's 16 days of incarceration following this arrest, OCS set up visits with Gideon. McDaniel also brought Christina a Fairbanks Native Association application for treatment programs at the Women and Children's Center and the Ralph Perdue Center, both located in Fairbanks. Christina was placed on the waitlist in both programs but apparently failed to keep her place by calling in weekly; McDaniel testified that these calls had to be made by the applicant, so she could not have called in on Christina's behalf.

McDaniel also arranged for Christina to take a mental health assessment with Turning Point Counseling Services while she was incarcerated. Christina told the evaluator, "Alcohol is my biggest problem"; she also mentioned domestic violence and her refusal to leave Damian as factors contributing to Gideon's removal. The evaluator diagnosed Christina with alcohol dependence and anxiety disorder, described her prognosis as "guarded" and noted that she had "minimal social supports or resources that could help her succeed in outpatient services." The evaluator recommended extended residential treatment to address her chemical dependency and abuse and trauma histories. She also recommended post-treatment outpatient care and participation in Alcoholics Anonymous.

In mid-September 2009 Christina was released from jail into Karen's care as a third-party custodian. OCS arranged for supervised visits with Gideon one to two times per week. Christina was also required to participate in random urinalysis testing (UAs). McDaniel encouraged Christina to attend Shades of Growth's intensive outpatient treatment program until she could get into a treatment facility. Christina attended one or two sessions but stopped attending because she "didn't feel like [she] was getting anything out of it" and because, as she told McDaniel, she wanted to work on getting her GED instead. McDaniel also referred Christina to parenting classes and supervised visits at the Resource Center for Parents and Children, but Christina did not attend any of these classes because she moved back to Venetie.

Around this time, OCS added the concurrent goal of adoption to the case plan's initial goal of reunification. Christina was reincarcerated for violating the terms of her release in late October. After her release, she returned to Venetie with Damian, who had also been recently released from custody. They did not initially inform OCS of their move. After making contact with Christina and Damian, McDaniel was able to speak with them "probably once a month," by her estimate, and sent letters attempting to get them engaged in services. Her communications with the couple during this period were primarily through Damian. In November 2009, five months after taking Gideon into custody, OCS changed its goal from reunification or adoption to solely adoption.[8] McDaniel notified Damian that the goal had changed, both by telephone and in a letter.

### E. Goal Of Adoption To Eventual Termination (December 2009 To September 2010)

In December 2009, Christina left a message for McDaniel asking if McDaniel could

---

8. This permanency plan was approved in February 2010.

bring Gideon to Venetie the next time she visited. There is some ambiguity as to whether McDaniel received this message, but the record is clear that McDaniel never took Gideon to visit Christina in Venetie. McDaniel often had difficulty communicating with Damian and Christina when they were in Venetie because they had no functioning telephone. Christina had no visits with Gideon from November 2009 until January 2010.

Christina had earlier expressed interest in attending Old Minto Recovery Camp with Damian. McDaniel testified that OMRC may have been appropriate for Damian, but it was not one of the recommended service providers for Christina because it did not provide the level of treatment Christina needed and because it would not allow Christina to separate from Damian and "work on herself as an individual." Nevertheless, in January 2010, Christina called McDaniel and asked for plane tickets so that she and Damian could fly to OMRC the following day. McDaniel, who testified that she did not know before this time that Christina was planning to attend OMRC, told Christina that this was insufficient notice to provide the tickets and reiterated that OMRC was not a recommended placement. She later learned from the staff at OMRC that Christina and Damian would not have been eligible to attend the program even if they had been given tickets to get there because neither had completed the required medical intake paperwork.

McDaniel arranged to fly Christina and Damian from Venetie to Fairbanks to visit Gideon in January and February 2010. The couple returned to Fairbanks in February 2010 and Christina moved back in with Karen.

On March 2, 2010, McDaniel filed a Petition for Termination of Parental Rights. Also in March, Christina was remanded to NorthStar Center, a halfway house, to serve the remainder of her September 2009 alcohol-related charges. McDaniel arranged for supervised visits with Gideon during Christina's time at NorthStar Center. Christina also completed an updated substance abuse evaluation with Shades of Growth while at NorthStar. She told the assessor she had not consumed alcohol since October 2009. As in the July 2009 assessment, she stated that she did not believe her drinking was a problem. The assessor indicated that Christina displayed high defensiveness, which "usually indicates a person is concealing information or minimizing their problems." The assessor cited other signs that Christina could be attempting to minimize the extent of her alcohol problem: Christina said in this assessment that she started drinking at age 15 (rather than 13 as she had stated in the July 2009 assessment or 12 as she ultimately testified at trial) and she reported drinking smaller quantities than she had acknowledged previously. The assessor again concluded that Christina was in the "pre-contemplation" stage and recommended residential treatment, domestic violence education, and parenting classes. She also recommended a psychiatric evaluation.

After her release in late March, Christina told McDaniel she was living with Karen. McDaniel again set up random UAs for Christina, who called in inconsistently and missed multiple UAs during April 2010.[9] Christina also began the Changing Patterns domestic violence program but attended for only three or four weeks of the nine-month program; she testified that she "thought it'd be better" if she attended after she got out of treatment, but she did not discuss this decision with McDaniel. Christina stated this was partly due to the difficulty she had contacting McDaniel.

In Spring 2010 Christina asked McDaniel for a letter that would move her up the waiting list for subsidized housing. McDaniel refused to write the letter because, as she later explained, "the letter states that the parents are at the point of reunification with the child and need[ ] the housing to accommodate that." McDaniel believed that Christina was not seeking substance abuse treatment and was not yet at the point of reunification with Gideon. Christina took two UAs in May 2010; one was negative, but the other came back positive for cocaine. McDaniel did not discuss this result with

9. The one test Christina took was negative.

Christina, who had fallen out of contact and stopped calling in for UAs during the month of June. At some point after the positive UA result, Damian called to schedule a visit with Gideon. McDaniel testified that she believed he was calling on behalf of the couple. Because Gideon had chicken pox, his parents were not allowed visitation with him at that time.

Christina was arrested for minor consuming alcohol on June 24. She pled no contest and was sentenced to 90 days in jail, with 60 days suspended and the option of completing the treatment program at the Ralph Perdue Center in lieu of serving jail time. Christina entered the Ralph Perdue Center in Fairbanks on June 28. She testified that she entered the program because she wanted to get her son back, and that she had already made the decision to go there before she was arrested. The Ralph Perdue program was not long enough or intensive enough to qualify as a Level III.3 residential treatment program as recommended, but it is unclear whether McDaniel was aware that Ralph Perdue did not meet these requirements or whether she discussed the issue with Christina when she provided applications to the program. On the day she checked in, Christina reestablished contact with OCS and arranged for visitation with Gideon. According to Christina, she had difficulty reaching McDaniel and had to contact McDaniel's supervisors at OCS to set up visitation. Christina completed the program at Ralph Perdue on July 26 but at trial she testified she was not familiar with the program's after-care plan.

The termination trial took place beginning on July 21, 2010. Damian appeared telephonically and agreed to relinquish his parental rights at the outset of the trial. The court heard extensive testimony from Christina, McDaniel, and Markkanen. Joyce Copeland and Lisa Hay—who had conducted Christina's substance abuse assessments and behavioral assessment—also testified, qualifying without objection as expert witnesses on substance abuse and domestic violence, respectively. Copeland testified regarding the effects parents' alcohol abuse may have on young children, including deprivation of basic needs, trust and emotional issues, higher likelihood of legal problems in later life, and poor academic performance. She also noted the link between domestic violence and alcohol abuse. Hay also testified to this link and described the emotional and psychological problems experienced by children exposed to domestic violence. Hay stated that children between birth and age three are especially vulnerable to developing social and behavioral problems as a result of such exposure.

On September 16, 2010, the superior court issued a 58–page decision terminating Christina's parental rights. The court concluded that: (1) Gideon was a child in need of aid under AS 47.10.011(6), (8), (9), and (10); (2) Christina failed, within a reasonable time, to remedy the conduct that placed Gideon at substantial risk of injury; (3) OCS made active efforts to prevent the breakup of the family; (4) Christina's continued custody of Gideon was likely to result in serious emotional or physical damage to him; and (5) termination of Christina's parental rights was in Gideon's best interest. The superior court took judicial notice that on August 3, 2010, six days after closing arguments in the trial, Christina was again arrested for minor consuming alcohol. According to the reply brief Christina filed on appeal, that charge was later dismissed.

## III. STANDARD OF REVIEW

 In CINA cases, we review the superior court's factual findings for clear error.[10] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[11] As we have noted, whether a parent has "remedied the conduct or conditions ... that place the child at sub-

---

**10.** *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 175 P.3d 1263, 1267 (Alaska 2008) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 88 P.3d 527, 529 (Alaska 2004)).

**11.** *Id.* (internal citations omitted).

stantial risk" and "whether returning the child to the parent would place the child at substantial risk of physical or mental injury" are factual determinations best made by a trial court after hearing testimony and reviewing evidence, not legal determinations to which this court may apply its independent judgment.[12] Best interest determinations are likewise factual findings subject to clear error review.[13] However, whether the expert testimony requirement of ICWA is satisfied is a pure question of law to be reviewed de novo.[14] And whether OCS has made active efforts as required by ICWA is a mixed question of law and fact; our court reviews the questions of law de novo.[15] "We bear in mind at all times that terminating parental rights is a drastic measure." [16]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Finding That Christina Failed, Within A Reasonable Time, To Remedy The Conduct That Placed Gideon At Substantial Risk Of Harm.

Alaska Statute 47.10.088(a)(2) provides that parental rights may be terminated if the court finds by clear and convincing evidence that the parent involved "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm" or "has failed, within a reasonable time, to remedy the . . . conditions in the home that place the child in substantial risk" of physical or mental injury. In reaching its determination, the court may consider "any fact relating to the best interests of the child," including: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of

effort by the parent to remedy the harmful conduct or conditions; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.[17]

In its August 2009 predisposition report, OCS identified a number of conditions that placed Gideon at risk, including his parents' inconsistent presence in his life, his parents' substance abuse problems, and the domestic violence in the family home. The report outlined changes Christina needed to make to remedy those conditions, in particular completing a treatment program, building a support network to help her stay sober, and following through on the recommendations she received from mental health and domestic violence assessments.

### 1. Christina did not remedy the conduct that placed Gideon at substantial risk of harm.

■ The superior court found that Christina failed to remedy the substance abuse and domestic violence issues that led OCS to take custody of Gideon. Specifically, the court noted that Christina was aware of Joyce Copeland's recommendation that she enter a Level III.3 long-term substance abuse treatment program, yet failed to take the steps necessary to enter Dena A Coy or Women and Children's Center (both of which would have allowed Gideon to live with her), or even OMRC (which McDaniel had made clear was not recommended for Christina). She eventually entered the Ralph Perdue program, a 28-day program that did not meet Level III.3 requirements. The superior court found that Christina's motives for attending Perdue were "mixed," and gave

12. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 234 P.3d 1245, 1253 (Alaska 2010) (internal quotation marks and citations omitted).

13. *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 77 P.3d 715, 721 (Alaska 2003) (citing *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 67 P.3d 648, 650–51 (Alaska 2003)).

14. *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 1013, 1018

(Alaska 2009) (citing *E.A. v. State, Div. of Family & Youth Servs.,* 46 P.3d 986, 989 (Alaska 2002)).

15. *Id.*

16. *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 79 P.3d 50, 53 (Alaska 2003) (quoting *R.J.M. v. State, Dep't of Health & Soc. Servs.,* 946 P.2d 855, 861 (Alaska 1997)) (internal quotation marks omitted).

17. AS 47.10.088(b).

"little weight" to the possibility that she entered the program because she realized she needed to do something about her drinking. The court also characterized Christina's answers to questions about what she had learned in treatment as "shallow and insincere." The superior court further concluded that "[o]n the domestic violence front, [Christina] did virtually nothing," attending only a few sessions of the Changing Patterns domestic violence treatment program and continuing her relationship with Damian despite the recommendation that she end it.

Christina contends that the conditions causing Gideon's removal had been remedied by the time of termination: she had completed substance abuse treatment and had been sober for 34 days, and she testified that she was no longer seeing Damian, whose violent behavior had been the immediate cause of Gideon's removal. Christina also argues there is no evidence that she drank alcohol around Gideon or that her drinking caused him harm.

The superior court's conclusions are supported by the record. Although Christina denied having received a copy of the substance abuse assessment, Joyce Copeland testified that the first assessment she gave Christina (which resulted in the recommendation for Level III.3 treatment) was mailed to Christina's address in Venetie and that she appeared to have picked up the second assessment. McDaniel also testified to having discussed Copeland's assessment with Christina and explained that the recommendation was for a long-term treatment program. Despite being aware of this recommendation, Christina missed multiple opportunities to attend substance abuse treatment, including opportunities that would have allowed Gideon to be placed with her during treatment. She disappeared and was subsequently arrested when she was scheduled to go to Dena A Coy. She appears to have lost her place on the waitlist

for the Women and Children's Center by failing to call in on a weekly basis. She did not complete the requisite medical tests to attend OMRC, and she only called McDaniel one day before she wanted to travel to OMRC. Christina acknowledged that she stopped attending the Changing Patterns domestic violence program after three or four weeks, testifying that she thought it would be better to attend after she had finished substance abuse treatment.

In light of her failure to follow through with recommended treatment despite several opportunities to do so, we are unconvinced by Christina's claim that the superior court erred when it found she failed to remedy her substance abuse problems by attending a shorter treatment program and staying sober for 34 days. Christina attended multiple treatment programs as a teenager and she had multiple opportunities to recognize that alcohol was a significant danger to her and to Gideon. According to Joyce Copeland, Christina lacked a support network to help her stay sober. These factors placed her at high risk of relapse.[18] The superior court also noted in its findings that Christina was arrested for minor consuming alcohol within eight days of leaving treatment at Ralph Perdue—about one week after the conclusion of trial.[19] Because evidence of this arrest was not before the court at trial and Christina had no opportunity to be heard on the issue, the superior court should not have considered the arrest. However, we find that the superior court's conclusion that Christina failed to remedy her conduct is supported by the evidence showing that Christina failed to pursue several opportunities for recommended treatment and was determined to be at high risk of relapse based on Copeland's assessment. Thus, although the court erred by considering the post-trial arrest, its error was harmless.

Even if it is true that Christina's drinking has generally not been in Gideon's presence,

---

18. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 234 P.3d 1245, 1261 (Alaska 2010) (holding that "the trial court properly relied on the mother's history of relapses and the questionable degree to which she accepted that she had a substance abuse problem" when it found that she had failed to remedy substance abuse issues despite a period of sobri-

ety) (citing *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 74 P.3d 896, 902–03 (Alaska 2003)).

19. On August 20, 2010, the State filed documents associated with Christina's post-trial arrest.

we have held that a child need not be present when substance abuse is occurring in order to suffer its negative impacts.[20] And as the State points out, Christina's drinking resulted in long absences and an unsafe environment that placed Gideon at risk regardless of whether he directly witnessed substance abuse.

Christina's failure to pursue recommended treatment to address both substance abuse and patterns of domestic violence also increases the risk that she will continue to be involved in violent relationships. As Lisa Hay testified, alcohol use by victims of domestic violence often exacerbates their injuries and decreases their ability to get help. Hay noted that, although breaking up with Damian was a "good step" for Christina, participating in a program like Changing Patterns would be important to help her "learn why she was in [an abusive] relationship in the first place" and avoid such relationships in the future. Finally, the superior court expressed doubt that Christina *had*, in fact, separated from Damian: "Given the amount of time she has been with [Damian], her financial dependence upon him . . . , [and] her past expressions of an unwillingness to leave him, the court does not find her uncorroborated testimony that she has ended her relationship with [Damian] credible." We have held that "trial courts are in the best position to weigh witness credibility," [21] and the superior court's conclusion appears to be supported by the record. To the extent Christina has not addressed the underlying factors that made her a victim of domestic violence and may even still be involved with her abuser, she has failed to remedy the conditions placing Gideon at risk.

## 2. Christina was given a reasonable time in which to remedy the conditions placing Gideon at substantial risk of harm.

■ Christina argues that she was not given "a reasonable time" to remedy the conditions placing Gideon at risk of harm. She puts particular emphasis on what she describes as the "shocking" timeline of the case. Gideon was born in February 2009 and taken into OCS custody in June 2009, when he was less than four months old. In September 2009, OCS added adoption as a concurrent goal to reunification. Two months later, in November 2009, the goal was modified to adoption only. OCS filed its petition for termination in early March 2010, for a total of approximately nine months between the time Gideon was taken into custody and the filing of the petition. The termination trial took place in July 2010, when Gideon was 17 months old—approximately 13 months after OCS initially took custody.

Christina argues that AS 47.10.088, which mandates that OCS petition for termination when a child has been in foster care for at least 15 of the past 22 months, "soundly suggests that 22 months is a reasonable time period during which both the 'efforts' required and the decision regarding the initiation of a termination can be made." Christina also points to language from the superior court's findings that she would need "a total of 15 to 21 months to complete the steps in her case plan" and "[13] months would not . . . afford her adequate time." She also cites recent CINA cases in which this court has terminated parental rights after periods of multiple years.

These arguments are not persuasive. First, as Christina acknowledges in her brief, AS 47.10.088(g) explicitly allows OCS to file a petition for termination *before* the expiration of the mandatory foster care period (i.e., 15 out of 22 months) if it "determines that filing a petition is in the best interests of the child." This provision suggests that the 22–month period is not intended as a minimum time OCS must wait before filing.[22] Rather,

---

**20.** *See, e.g., Barbara P.*, 234 P.3d at 1258–59 (holding mother's testimony that she took precautions to avoid exposing children to her drug use had only limited relevance because "the statute does not require that a child be present when the drug use occurred").

**21.** *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 762 n. 16 (Alaska 2009) (citing *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 222 (Alaska 2007)).

**22.** Indeed, where a child has been in foster care for 15 consecutive months, the statute potentially

OCS determines when to file a petition based exclusively on the best interests of the child; the statute defines "reasonable time" not as a specific number of months or by reference to parents' needs, but as "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[23] As the superior court noted, this period is likely to be shorter for young children; the legislature has recognized, and expert witnesses confirmed in this case, that children "undergo a critical attachment process before ... they reach six years of age," and a failure to bond with adult caregivers during this time can result in lasting emotional damage.[24]

Christina also omits crucial context from the superior court's description of the time she needed to complete treatment. The superior court did observe that 13 months would not be adequate time for Christina to complete her case plan, but the court went on to state, "The force of this argument is blunted, however, by the fact that, by the time of trial, [Christina] had done virtually nothing to *start* changing her behaviors that placed [Gideon] at substantial risk of harm." The court's language implies that it would not have expected Christina to complete the treatment she needed within 13 months, but her failure to make any real progress toward doing so indicated that there was a very low likelihood of returning Gideon to her care within a reasonable time based on his age and needs—a permitted consideration under AS 47.10.088(b). The superior court concluded, "Given [Christina's] slow progress to date, [Gideon] could be two and one-half or three years old before [Christina] was ready to be a stable, protective parent for him. [Gideon] cannot wait that long: His needs for permanence, stability and security are too great."

Gideon's young age and the slow pace of Christina's progress are also significant in distinguishing this case from other parental termination cases Christina cites. It is true that the nine-month period between OCS's taking custody of Gideon and petitioning for termination of parental rights was unusually brief relative to the majority of CINA cases. As Christina points out, OCS has frequently remained involved with families for multiple years before petitioning for termination.[25]

But as noted, very young children have unique needs for permanency and bonding. McDaniel cited Gideon's age as an important factor in the speed with which OCS added adoption as a concurrent goal, noting "it is different to look for permanency for an infant than a 10–year–old or a 14–year–old" and "the fact that [OCS involvement] started so early in this child's life is definitely a factor" in the timing of termination proceedings.[26]

---

sets 15 months as the *maximum* period before OCS is required to pursue termination.

23. AS 47.10.990(28).

24. AS 47.05.065(5) (providing for expedited placement of children, especially those under age six).

25. *See, e.g., Jon S.*, 212 P.3d at 759–60 (two years and two months between CINA petition and termination petition); *Thomas H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 184 P.3d 9 (Alaska 2008) (four and a half years between initial OCS involvement and termination trial; one and a half years between removal of second child and termination trial); *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1265–66 (Alaska 2008) (at least one and a half years between OCS taking custody and petitioning for termination); *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896 (Alaska 2003) (ten years between initial OCS involvement and termination petition). In cases where OCS has petitioned for termination less than one year after taking custody of an infant, there is typically a history of OCS involvement with the parents' older children. *See, e.g., Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245 (Alaska 2010) (one month between child being taken into OCS custody a few days after birth and petition for termination, where OCS had become involved with older sibling about one and a half years earlier).

26. McDaniel implied that OCS's involvement with a child as young as Gideon was indicative of a particularly troubling situation: "It is very hard for reports of harm to come out of Venetie because they have no [Village Public Safety Officer], there's no troopers out there, and especially since this child was not going to school and the fact that this child came into our radar within two months of birth and the activities of the parents were already very dangerous, lethal, and sporadic is a definite concern."

We do not suggest that 13 months is an objectively "reasonable time" for parents to remedy their conduct; as reflected in our past CINA decisions, this determination must be made on a case-by-case basis and the amount of time considered "reasonable" will vary. But we emphasize that the statute clearly puts the criteria for "reasonable time" in terms of the child's needs. Based on Gideon's age and Christina's lack of progress, we cannot say that it was clear error for the superior court to find that the time allowed Christina was "reasonable" in light of Gideon's needs.

We hold that the superior court did not err by finding that Christina failed to remedy, within a reasonable time, the conditions placing Gideon at risk.

### B. The Superior Court Did Not Err By Finding Clear And Convincing Evidence Of Active Efforts By OCS To Reunify The Family.

 Under the Indian Child Welfare Act (ICWA), "Any party seeking to effect . . . termination of parental rights to . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[27] We have previously cited one commentator's description of "active efforts" as distinguished from "passive efforts":

> Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own.

For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.[28] When evaluating the State's efforts, we look to the State's involvement in its entirety[29] and may consider "a parent's demonstrated lack of willingness to participate in treatment."[30] Active efforts must be proven by clear and convincing evidence.[31]

The superior court found that OCS made active efforts to help Christina reunite with her son, "reasonably pursu[ing] substance abuse treatment as the first and most important step" in her case plan. The superior court cited OCS's initial efforts to create a safety plan, as well as McDaniel's ongoing efforts to assist Christina. The court found that these efforts included: arranging assessments for substance abuse, domestic violence, and mental health; helping Christina apply to multiple treatment programs; making travel arrangements to get to assessments, UAs, and treatment programs; and scheduling visitation with Gideon in a variety of locations, including during Christina's periods of incarceration. Although Christina testified that McDaniel was frequently out of the office and difficult to reach, the superior court found this testimony "lacking in credibility" and typical of Christina's tendency to "shift blame to others or . . . excuse her own behaviors" when confronted with her own failures to communicate. The superior court gave greater credence to McDaniel's testimony that she traveled only four or five days a month, received very few messages from Christina, and was frequently unable to return Christina's calls because Christina could

**27.** 25 U.S.C. § 1912(d) (2006).

**28.** *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999) (quoting Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual 157–58 (1984)); *see also Dale H. v. State, Dep't of Health & Social Servs.,* 235 P.3d 203, 213 (Alaska 2010).

**29.** *Maisy W.,* 175 P.3d at 1268–69 (affirming termination even though the State conceded it

had not made active efforts during a three-month period, where the State's efforts as a whole met the standard).

**30.** *Id.* at 1268 (citing *N.A. v. State, DFYS,* 19 P.3d 597, 603 (Alaska 2001)).

**31.** *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 763 (Alaska 2009).

not be reached at the contact numbers she left.

Christina argues before this court that OCS was "complacent and work-shy" in its implementation of what she calls a "perfunctory plan." She objects to the fact that OCS communicated with her through Damian, thus sending mixed messages about her continued relationship with him. Christina also argues that McDaniel did not pursue maternal-side placement options for Gideon in Venetie or Fort Yukon, observed Christina and Gideon together on only a few occasions, did not address Christina's housing or financial needs, wrongly chose to address Christina's substance abuse problems before addressing domestic violence as a contributing factor in her alcohol use, and focused on encouraging Gideon's potential adoptive mother rather than choosing to visit Christina in Venetie.

The extensive record of OCS involvement in this case amply supports the superior court's finding of active efforts. McDaniel and other OCS staff initiated most of the steps in Christina's case plan, including scheduling assessments, setting up UAs, and facilitating applications and transportation to treatment programs (which, with the exception of Ralph Perdue, Christina chose not to attend). Christina's claim that she was unable to reach McDaniel is not credible given McDaniel's testimony and the superior court's assessment of Christina's defensive attitude; in fact, it appears that Christina's own frequent moves and unreliable contact information were responsible for hindering communication with OCS and undermining the success of its efforts.

Nor do Christina's other arguments support her characterization of OCS as "complacent." As the State notes in its brief, "[i]t was ultimately Christina's decision to remain with Damian" and "McDaniel was simply recognizing the reality that the couple was living together again" when she communicated through Damian. Moreover, McDaniel testified that she discussed maternal-side relative placements with Christina's mother and "worked with the [Fort Yukon] tribe extensively to locate other relatives" for possible placement, determining that there was no relative placement available on Christina's side of the family. Although McDaniel observed Christina and Gideon in person on relatively few occasions, she received and reviewed regular reports from OCS employees who supervised visitation. McDaniel's refusal to provide a letter to help Christina obtain subsidized housing is consistent with OCS's policy, which required that the family in question be eligible for reunification; McDaniel testified that she would have provided the letter had Christina been engaged in treatment and moving toward reunification, but that Christina was not yet doing so. McDaniel also noted that Christina had rejected available housing options, such as living with Karen or her birth parents or going to the Grandma's House shelter.

McDaniel's decision to focus on Christina's substance abuse problems as the first step in treatment was reasonable. Lisa Hay testified, and the superior court found, that Christina would not benefit fully from domestic violence treatment or other forms of education until she had addressed her substance abuse. Finally, Christina's claim that McDaniel failed to visit her and Gideon in Venetie appears to focus on the brief period between OCS taking temporary custody in June and Ronda's surrender of Gideon in July. McDaniel's ongoing contact with Christina at other times was sufficient to compensate for any shortcomings during this period, and the fact that McDaniel did not visit Christina in either Fort Yukon or Venetie at other times must be attributed, at least in part, to Christina's "nomadic" lifestyle and failure to keep OCS up-to-date on her whereabouts.

The superior court acknowledged, and we agree, that "perhaps greater effort could have been made to provide visits from November 2009 through February 2010." But the superior court noted that Christina's lack of communication largely impeded OCS's ability to help Christina during this period. In addition, we have held that periods of inactivity are not fatal to a finding of active efforts where OCS's participation has been active "in its entirety." [32] Even taking into account this less-active period, and assuming

32. *Maisy W.,* 175 P.3d at 1268.

that McDaniel could have done more to observe Christina and Gideon in person or refer Christina to alternative housing options, we conclude the superior court correctly found OCS's work in its entirety took Christina "through the steps of [her] plan" [33] and constituted active—though unsuccessful—efforts to keep the family together.

### C. The Superior Court Did Not Err By Concluding That Gideon Would Be At Substantial Risk Of Emotional Or Physical Damage If Returned To Christina's Custody.

ICWA provides that "[n]o termination of parental rights may be ordered ... in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child." [34] Such a determination requires proof that a parent's conduct is likely to harm the child and that the parent is not likely to change her conduct.[35] The expert witnesses providing testimony are not necessarily required to meet with the parties, but "the expert opinion should be based on the particular facts and issues of the case." [36]

The superior court found that Gideon had been exposed to domestic violence and subjected to neglect while in Christina's care. The court also found evidence beyond a reasonable doubt that Christina's conduct, and its effects on Gideon, were unlikely to change: she had "done virtually nothing to help herself change since the CINA petition was filed" and was, according to the expert testimony of Copeland and Hay, at a high risk for substance abuse relapse and/or a continued pattern of abusive relationships.

Christina argues that the two expert witnesses had little individual contact with her and failed to address specific issues facing Native rural families. She contends that Gideon was not impaired by the four months he spent with her, and "the fact that [she] had been sober and away from Damian at the time of trial only shows less likelihood of harm." Finally, Christina cites the New York case of *Nicholson v. Williams*[37] for the proposition that a mother's inability to prevent her child from witnessing domestic violence cannot be the sole basis for removing the child, and that battered mothers are good candidates for rehabilitation "because they typically enter the child welfare caseload not because of any deficit in parenting."

We find the superior court's findings to be supported by the record. The court's finding that Gideon was a child in need of aid clearly set out the evidence and expert testimony the court relied on in concluding that Christina's parenting posed a substantial threat of harm to Gideon. And both Christina's history and the testimony of Copeland and Hay support the finding that Christina is unlikely to change her behavior in a reasonable time.[38] Christina's claim that the evidence was insufficient is unpersuasive.

33. *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999) (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157–58 (1984)).

34. 25 U.S.C. § 1912(f) (2006).

35. *L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 950 (Alaska 2000).

36. *C.J. v. State, Dep't of Health & Soc. Servs.,* 18 P.3d 1214, 1218 (Alaska 2001); *see also J.A. v. State, DFYS,* 50 P.3d 395, 400–02 (Alaska 2002) (holding that expert testimony was sufficient to support the conclusion that father's children would be seriously harmed if returned to him, even though the experts did not interview the parties).

37. 203 F.Supp.2d 153 (E.D.N.Y.2002).

38. The superior court cited Christina's post-trial arrest as "convincing evidence that she has not yet been able to change her behavior patterns" and that Gideon would therefore be at risk in her custody. As discussed, it was improper for the superior court to consider evidence of an arrest that was not part of the trial record. But we conclude that this error was harmless because the superior court had more than sufficient other evidence of Christina's failure to change her conduct: the court also cited Christina's multiple Minor Consuming Alcohol convictions prior to trial and the fact that she had "done virtually nothing to help herself change since the CINA petition was filed," had resisted participating in the long-term treatment options recommended for her and made available to her, and had made visitation with Gideon difficult by frequently changing her residence.

We have established that expert witnesses need not meet with individual parties in order to provide testimony regarding the risks of continued custody.[39] Here, both of the State's expert witnesses *did* interview Christina in person, and Copeland conducted an additional assessment over the telephone. Each witness testified not only about the general effects of domestic violence and substance abuse, but also about the specific implications of Christina's assessments. Both Copeland and Hays were qualified as experts in their fields with regard to Native and non-Native families. The fact that neither witness specifically addressed Native issues is not determinative; our court has held that expert testimony on Native culture is unnecessary where the basis for termination does not implicate cultural bias.[40]

Christina's argument that Gideon showed no signs of impairment as a result of spending time with her is undermined by the testimony the superior court heard regarding the long-term emotional and psychological harms to children exposed to domestic violence and substance abuse. As discussed, Christina's claims of sobriety and separation from Damian are unconvincing given her failure to pursue more extensive treatment. Similarly, Christina's reliance on *Nicholson* is misplaced: the superior court found that Gideon was a child in need of aid based not only on exposure to Damian's domestic violence, but also on Christina's own substance abuse and related neglect.

We hold that the superior court did not err by finding that Gideon would be at substantial risk of emotional or physical damage if returned to Christina's custody.

### D. The Superior Court Did Not Err By Finding Termination Of Parental Rights Was In Gideon's Best Interests.

Under AS 47.10.088(c), a court is required to consider the best interests of the child before terminating parental rights. CINA Rule 18(c)(3) similarly provides that the court must find that termination is in the best interests of the child. The superior court found that Gideon's visits with Christina had generally gone well, but that "[h]is ability to bond with [Christina] has been hampered by her roaming lifestyle and infrequent visits with him stemming from her failure to keep OCS apprised of her whereabouts." The superior court also noted that, because of her treatment needs, Christina was not likely to be able to have Gideon with her in the near future. The court raised concerns about Christina's ability to address Gideon's potential special needs (as indicated by tests showing he was delayed) in addition to the many other challenges she faces.

Christina's arguments on this point are largely repetitive of arguments already discussed: she characterizes Damian's drinking and domestic violence as the "direct and primary causes of Gideon's removal" and contends that if OCS helps her find housing and a job, Gideon may be able to live with her within a reasonable time. She argues that there was little evidence presented that Gideon had bonded with his foster family. She also reiterates her desire to stay close to family members as a reason for not seeking treatment in Anchorage and for moving frequently.

Given Christina's ongoing problems with substance abuse and domestic violence and her refusal to pursue treatment despite multiple opportunities to do so (including opportunities in Fairbanks, home of Christina's foster mother and the closest city to Fort Yukon and Venetie), there is strong support for the superior court's finding that Christina is unlikely to be capable of caring for Gideon within a reasonable time. McDaniel testified that Gideon exhibited attachment to his foster mother, with whom he had lived for over 12 months by the time of trial. Even if there is, as the superior court found, "insufficient evidence from which [to] conclude that [Gideon] has failed to completely bond with [Christina]" and limited evidence of bonding with the foster mother, Gideon's foster home offers to provide him with immediate stability at this vital developmental stage—something his mother, despite

---

**39.** *C.J.*, 18 P.3d at 1218.

**40.** *L.G.*, 14 P.3d at 952–53.

her apparently genuine desire to care for her son, cannot provide now or in the near future. The superior court did not err by finding termination of parental rights to be in Gideon's best interest.

## V. CONCLUSION

We AFFIRM the decision of the superior court to terminate Christina J.'s parental rights.