NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TIM H., | ) | |
| | ) | Supreme Court No. S-15272 |
| Appellant, | ) | |
| | ) | Superior Court Nos. |
| | ) | 3PA-11-00075/00077 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1497 – May 7, 2014 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Brian D. Camozzi, Frontier Law Group, LLC, Anchorage, for Appellant. Clyde E. Sniffen, Jr., Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

---

\* Entered under Appellate Rule 214.

1. Tim H.[1] appeals the trial court's termination of his parental rights to two of his children. He raises several challenges to the trial court's finding, by clear and convincing evidence, that the Alaska Office of Children's Services (OCS) made reasonable efforts to provide him with services designed to enable his children to be safely returned to him. The trial court was required to make this finding by AS 47.10.088(a)(3) and Alaska Child in Need of Aid Rule 18(c)(2) before terminating Tim's parental rights.

2. At the time of the events leading to OCS's involvement with this family, four children were living in the home. In June 2011 Tim accused then-nine-year-old Tim Jr. of stealing. As punishment, Tim repeatedly and severely beat the child with a leather belt over a period of two days. When the belt broke Tim took out a second belt and continued the beating. Tim Jr. reported that Tim hit him over a hundred times. Tim Jr. suffered significant injuries and bleeding as a result of this beating. He had multiple bruises on his legs, buttocks, and lower back. He had scabs on his hip and buttocks where the skin had broken, and one buttock was swollen to almost twice its normal size. The three other children in the home, including a two-year-old child, witnessed the beating. Worried that Tim would seriously injure Tim Jr., one of the other children, a teenager, reported the incident to the police and to OCS.

3. OCS took the children into emergency custody and drafted a case plan that, among other things, called for Tim to participate in a psychological evaluation and to follow all recommendations. Tim completed the evaluation with Dr. Michael Rose in November 2011. Dr. Rose diagnosed Tim with narcissistic personality disorder. Dr. Rose noted that persons with this disorder tend to be manipulative and deceptive. One of Dr. Rose's recommendations was that Tim participate consistently in individual

---

[1] A pseudonym is used to protect the privacy of the family.

psychotherapy, although Dr. Rose noted that Tim was likely to resist therapy and to disagree with Dr. Rose's recommendations.

4.      At a meeting shortly after this evaluation, social worker Jennifer Dale discussed Tim's evaluation, including the therapy requirement, with him. Dale testified that Tim understood the requirement and that he did not want help locating a therapist. She testified that "he would always say, I'm going to find my own, I'm going to do it on my own, I'm going to go through the [military] base." She told him that when he found a therapist, "you're going to have to let me know who it is so that I can provide collateral information." Dale was prepared to provide Tim with a list of acceptable therapists, but Tim did not accept her offer. Dale tried numerous times to meet with Tim to discuss the requirements of Tim's case plan but had little success in contacting him. Tim told Dale that he met with a therapist on base for a couple of sessions, but when that therapist left Alaska, months passed before Tim located another therapist. Tim never provided Dale with the name of the therapist he had seen on base, and, according to Dale, he did not know the name himself.

5.      Tim eventually retained Dr. Washington Brown, who, in February 2013, conducted a new psychological evaluation of Tim. Dr. Brown did not contact OCS or review any collateral information when evaluating Tim, stating that he did not want negative information about Tim to "muddy" his assessment. Tim did not supply Dr. Brown with details of the incident that resulted in his children's removal other than to tell Dr. Brown that he had disciplined one of his children by spanking him, and he did not reveal to Dr. Brown the existence of criminal charges that had resulted from the incident.

6.      On March 19, 2013, Tim and his attorney met with newly assigned OCS social worker Raymond Edwards. They informed Edwards, incorrectly, that OCS had not contacted Tim for two years. They presented Edwards with Dr. Brown's

evaluation, demanded that visitation with the children begin immediately, and ended the meeting.[2] Edwards attempted to contact Dr. Brown through Dr. Brown's website, by telephone, and by email, but Dr. Brown did not return Edwards's messages.

7. On March 28, 2013, OCS filed a petition to terminate Tim's parental rights. The petition noted that the stated purpose put forth in Dr. Brown's evaluation of Tim was for Tim to obtain a "[s]econd opinion to get his sons returned from OCS Custody due to an alleged spanking," and that Dr. Brown's evaluation recommended that "the children should be returned immediately with visitation restored now."

8. On April 19, 2013, Dr. Brown testified at a placement review hearing. This was Edwards's first contact with Dr. Brown, who had begun to provide counseling to Tim earlier that week. The trial court later described Dr. Brown's testimony as not credible. The trial court found that at this hearing Edwards "made it clear . . . when he first had any exposure whatsoever to Dr. Brown, that Dr. Brown was not an acceptable counselor." If any doubt remained about whether counseling with Dr. Brown would satisfy Tim's case plan requirement, it was eliminated at a hearing held just over a month later when, on June 3, 2013, Edwards testified that OCS would "absolutely not" approve Dr. Brown as Tim's therapist.

9. Following a trial, the trial court terminated Tim's parental rights. In doing so the court determined that OCS had made reasonable efforts to provide Tim with reunification services.[3]

---

[2] OCS had begun visitation but had stopped it on the advice of the children's therapist, who determined shortly after receiving the case that visits were causing the children trauma.

[3] This finding is a mixed question of law and fact. *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, (continued...)

10. Tim's main argument on appeal is that OCS allowed him to participate in psychotherapy with a therapist, Dr. Brown, who was ultimately determined by OCS to be unacceptable. According to Tim, OCS did not communicate its misgivings about Dr. Brown to Tim, but instead unreasonably chose to allow Tim "to pursue a futile course of treatment that he reasonably believed was in compliance with his case plan." Tim's argument is not supported by evidence. Tim's social worker offered numerous times to help him fulfill his case plan requirements and offered to provide him with names of qualified therapists. But Tim, who wanted to locate his own therapist, declined the proffered assistance. Sixteen months into the case, Tim and his attorney appeared at a newly assigned social worker's office with a new psychological evaluation, conducted by Dr. Brown. Dr. Brown had conducted this evaluation without OCS's knowledge or input, and he had expressly declined to consider any information other than that provided by Tim himself because he did not want Tim's assessment to be "muddied." He also declined to inquire into the children's situation, yet he recommended that they be returned immediately to Tim.[4] Social worker Edwards attempted to contact Dr. Brown after Tim gave Edwards Dr. Brown's evaluation, but Dr. Brown did not return his messages. Within a month, Dr. Brown testified at a hearing at which Edwards was present. Dr. Brown testified that Tim had had his first therapy session with Dr. Brown earlier that week. After hearing Dr. Brown's testimony,

---

[3](...continued) 254 P.3d 1095, 1104 (Alaska 2011)). We review questions of law de novo and factual findings for clear error. *Id.* at 427-28 (citing *Christina J.*, 254 P.3d at 1103-04).

[4] Dr. Brown stated that he "wasn't interested" in finding out if the children were in counseling, because "I was interested in [Tim], that's what he paid me for, to assess him." At the termination trial the children's therapist, Brad Ohs, testified that because of the trauma that the visits with Tim had caused the children, he strongly recommended that visitation with Tim not be reinstated.

Edwards made clear that Dr. Brown was unacceptable as a counselor for Tim, and Tim acknowledged that he made a mistake in hiring Dr. Brown. Thus, while Tim delayed engaging in therapy for over a year after therapy was recommended for him and resisted OCS's efforts to help him engage with an acceptable therapist, OCS informed Tim upon its first exposure to Tim's chosen therapist that the therapist was unacceptable. Tim's argument that OCS looked the other way while he "pursue[d] a futile course of treatment" thus is not supported by the record.

11. Tim raises several other challenges to OCS's efforts to provide him with services. First, he argues that OCS should have facilitated contact between him and the children's therapist. Tim presents no legal support for this argument, which is without merit. Second, he argues that OCS stopped providing him with services when his social worker formed a mistaken belief that he did not want to be reunified with the children. This argument is not supported by the record. Third, he argues that the trial court erred in admitting and relying on evidence of services OCS provided to other members of his family in determining whether reasonable efforts were provided to him. Our review of the record does not indicate that the trial court erred in admitting or relying on any improper evidence, and its findings of fact and conclusions of law are solidly grounded in evidence that was properly admitted. Finally, he argues that he was wrongly denied credit for a family violence intervention program he completed. This argument reflects a misconception of the reunification process. Tim's social worker and the trial court were not concerned about whether Tim had technically completed the program; what concerned them was that, while participating in the program and even as late as the termination trial, Tim's actions and testimony demonstrated that he had not internalized the lessons that the program sought to impart. As we have stated, "the key issue in these cases is not whether parents participated in their case plans but whether

they actually benefit from the services and remedy their behaviors."[5]  The trial court found that despite OCS's efforts to provide him with services, Tim did not remedy his behaviors, and that the children would be at substantial risk of physical harm or mental injury if they were returned to him.  Tim's argument does not undermine the trial court's finding that OCS made reasonable reunification efforts for Tim's family, and Tim did not appeal the trial court's findings, which are fully supported by the record, that he did not remedy his behaviors and that the children would be at risk if returned to him.  The trial court's findings are supported by the record.

12.    For the foregoing reasons we AFFIRM the trial court's order terminating Tim's parental rights to the two children.

---

[5]       *Jeremy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1330, 2009 WL 415562, at *6 (Alaska, Feb. 18, 2009) (citing *Rick P. v. State, OCS*, 109 P.3d 950, 956 (Alaska 2005)).