*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

GRACE L., )
)
            Appellant, )
)
      v. )
)
STATE OF ALASKA, )
DEPARTMENT OF HEALTH & )
SOCIAL SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
)
            Appellee. )
_____ )

Supreme Court No. S-15108

Superior Court No. 3PA-09-00074 CN

O P I N I O N

No. 6925 – July 18, 2014

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Christi A. Pavia, Pavia Law Office LLC, Anchorage, for Appellant. Jacqueline G. Schafer, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.
STOWERS, Justice, dissenting.

I.      **INTRODUCTION**

          The superior court terminated a mother's parental rights based on evidence of her chronic delusions and the danger these delusions posed to her child. On appeal,

the mother argues that several aspects of the court's decision are not adequately supported. In particular, she argues that the Office of Children's Services (OCS) should have required an assessment of her psychiatric condition and monitored the course of her psychological therapy. But the record shows that the mother did receive a psychiatric evaluation at OCS's direction and that it would likely have been harmful to disrupt the positive relationship she had with her counselor. We thus conclude that the record supports the superior court's conclusion that OCS fulfilled its duty to make active efforts to provide this mother with services designed to prevent the breakup of her family.

## II.     FACTS AND PROCEEDINGS

Ronnie L. was ten years old when he was taken into OCS custody on July 31, 2009.[1] On July 6, 2009, OCS received a protective services report stating that Ronnie's mother, Grace, had appeared with him at a hospital emergency room, complaining that they had been sexually assaulted by women. The report reflected that Grace showed no physical signs of sexual abuse and that Ronnie denied knowledge of any abuse. Christine Sheridan, the social worker who investigated the report, interviewed Grace and Ronnie.

Because Grace was exhibiting troubling behavior, June Ober of Mat-Su Behavioral Health Services provided a crisis screening. Grace told Ober that she had taken medications for mental illness in the past but that she had not stayed on them because she disliked their side effects. Ober recommended that Grace participate in a psychological evaluation and receive medication. Grace signed a safety plan and agreed to seek mental health treatment in order to keep Ronnie safe. Sheridan attempted multiple times to follow up with Grace, but when she finally reached Grace by phone on

---

[1]     Pseudonyms are used throughout to protect the family's privacy.

July 20, 2009, Grace told her that she had consulted a lawyer and did not intend to participate in treatment for her mental illness.

OCS then filed an emergency petition to have Ronnie adjudicated a child in need of aid. The petition cited a number of protective services reports received over many years by OCS and OCS's attempts to intervene with the family. The petition concluded:

> [Grace] has demonstrated she will not follow through with the department's recommendations or follow through with her treatment plan regarding her mental health. Currently [Grace] is not on any psychotropic medication and [is] refusing treatment. [Ronnie] is exposed to her paranoia and frightening delusions on a daily basis. . . . [Children's Services Specialist] Sheridan and Supervisor Jones have observed [Ronnie] demonstrating paranoid behaviors. . . .
>
> The department feels that [Ronnie] is negatively impacted by his mother's untreated mental illness and intervention is required at this time.

The superior court held an emergency hearing and authorized OCS to take Ronnie into custody.[2]

OCS referred Grace for an assessment with clinical psychologist Dr. Grace Long, who reviewed Grace's medical history and conducted a brief interview with her. Dr. Long recommended that Grace continue in therapy, and that she also be evaluated by a psychiatrist to determine if medication would be appropriate for her.

Soon thereafter OCS entered into a case plan with Grace that identified Grace's priority needs as "[u]nresolved chronic or severe diagnosed mental health problems, [h]ealth problem or disability, [and] [i]neffective/harmful parenting skills."

---

[2] Grace and Ronald, Ronnie's father, later stipulated to Ronnie's adjudication as a child in need of aid. Ronald lived in a community far from Grace and Ronnie. Ronald later relinquished his parental rights to Ronnie.

The plan stated that Grace "has [a] long history of untreated mental health and instability in her life." The plan acknowledged that Grace and Ronnie share a strong, supportive, loving bond. It called for Grace to engage in mental health services and follow all recommendations, and its stated goals for Grace included decreasing or stopping the delusions, obtaining stable housing, completing a course of parenting classes, and participating in regular visitation with Ronnie.

In March 2010 Grace participated in a psychological evaluation with Dr. Melinda H. Glass, to whom OCS had referred her. The purpose of the evaluation was to determine how Grace's mental illness impacted her ability to act as an appropriate and protective parent. Grace told Dr. Glass that she had been working with Richard Gustafson, a clinician at South Central Foundation Behavioral Health; Grace stated that she wanted Gustafson to discuss the results of the evaluation with her.

Dr. Glass interviewed Grace, administered a number of tests, and reviewed collateral information. Dr. Glass diagnosed Grace with "[d]elusional disorder, mixed type, primarily persecutory and grandiose." She reported that Grace "has been inconsistent in her accessing of mental health treatment, in spite of it repeatedly being recommended. She has been fairly consistently diagnosed with delusional disorder with some questions of schizophrenia, but has apparently only taken medication for a short period of time."

Dr. Glass concluded that Grace "is likely to experience great difficulty safely and appropriately parenting any child . . . and is likely to be unable to provide [Ronnie] with guidance or stability." Dr. Glass noted indications that Grace had involved Ronnie in her delusions in the past, and she stated that such involvement "would have the potential of being destructive for him and his developing understanding of reality." Dr. Glass concluded, "As long as [Grace] continues to function with an

untreated delusional disorder she has the potential of causing great harm to her son as well as to herself."

Dr. Glass stated that, while it was important for Grace to receive mental health treatment if she were to have a safe and appropriate parenting relationship with Ronnie, her persecutory delusions would likely hinder her ability to participate in treatment. Dr. Glass noted that Grace appeared to have a good relationship with Gustafson, who "appears to understand some of her problems." Dr. Glass recommended that Grace continue in therapy, that she be referred to a psychiatrist for a medication review, and that she take any recommended medication to try to improve her ability to discern reality. Dr. Glass noted that Grace "is unlikely to do this without a court order, and may not even then."

In addition to referring Grace to Dr. Glass for an evaluation, OCS helped her locate stable housing, enroll in multiple parenting classes, and engage in family contact with Ronnie.

In June 2011 OCS filed a permanency report indicating that while Grace had attended parenting classes and therapy sessions with Gustafson, she had not resolved her mental health issues to the extent necessary to allow her to provide a safe and stable home for Ronnie,[3] she had not sought medication or direct intervention to address her mental illness, and she had refused to divulge her housing situation to OCS.

On January 6, 2012, OCS filed a petition to terminate Grace's parental rights to Ronnie. On May 3, 2012, in preparation for the termination trial, Dr. Glass conducted an updated psychological evaluation of Grace. Dr. Glass's report noted that Grace's delusional behaviors were ongoing. It stated that Grace's response pattern, in

---

[3] Gustafson later testified at the termination trial that he worked with Grace to enhance her ability to function in the world, but that he did not attempt to ameliorate her underlying delusions.

which she "endorsed a significant number of psychological symptoms related to paranoia, dissociation, flashback, and avoidance," was similar to her earlier evaluation, but that Grace "presented with more symptoms of depression than she did in the previous evaluation." Dr. Glass diagnosed Grace with "[d]elusional disorder, mixed type, primarily persecutory and grandiose," and identified "[m]ood disorder, [not otherwise specified]" as a rule-out diagnosis.

In her conclusions, Dr. Glass stated that Grace's "delusions appear somewhat more bizarre than they did in the previous evaluation," and she noted that "[i]n this evaluation she had difficulty completing an interview or making sense. It would appear that her paranoia is heightened and her ability to stay grounded in reality is less than it was in the past evaluation." Dr. Glass went on to state that Grace demonstrated no positive changes to her mental health status but instead appeared "somewhat worse." Dr. Glass found that "[t]reatment does not appear to be helping [Grace] address her mental illness and it is not known whether medication would have a significant impact. It is unlikely [Grace] would consider it as she has refused medication in the past."

The superior court held a trial on OCS's petition to terminate Grace's parental rights in May and August 2012. Following the trial, the superior court terminated Grace's parental rights to Ronnie.

Grace appeals the order terminating her parental rights. She argues that the superior court erred in finding that: (1) Ronnie was a child in need of aid; (2) Grace did not remedy in a timely fashion conduct or conditions that endangered Ronnie; (3) OCS made active reunification efforts to allow Ronnie to be returned to Grace's care; (4) Ronnie would likely suffer serious physical or emotional damage if Grace's custody were not terminated; and (5) termination of Grace's parental rights was in Ronnie's best interests. She also argues that she received ineffective assistance of counsel during the superior court proceedings.

## III. STANDARDS OF REVIEW

In child in need of aid cases we review a superior court's factual findings for clear error.[4] We review questions of law de novo.[5] A finding is clearly erroneous if our review of the entire record in the light most favorable to the party that prevailed at trial leaves us definitely and firmly convinced that the finding is mistaken.[6] Whether OCS made active, but unsuccessful, efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family is a mixed question of fact and law.[7] We review de novo "a request for disqualification of a judge based on the appearance of impropriety."[8]

## IV. DISCUSSION

### A. The Superior Court Did Not Err When It Concluded That Ronnie Was A Child In Need Of Aid, That Grace Did Not Remedy The Conditions That Placed Ronnie At Risk Of Harm, And That Ronnie Would Likely Suffer Serious Harm If Grace's Custody Were Continued.

Before terminating parental rights, a superior court must find, by clear and convincing evidence, that the child was in need of aid and that the parent did not timely

---

[4] *Sherman B. v. State, Dep't of Health & Soc. Servs.*, 290 P.3d 421, 427 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs.*, 254 P.3d 1095, 1103 (Alaska 2011)).

[5] *Id.* at 428 (citing *Christina J.*, 254 P.3d at 1104).

[6] *Philip J. v. State, Dep't of Health & Soc. Servs.,* 314 P.3d 518, 526-27 (Alaska 2013) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs.*, 249 P.3d 264, 269-70 (Alaska 2011)).

[7] *Christina J.*, 254 P.3d at 1104 (citing *Ben M. v. State, Dep't of Health & Soc. Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[8] *Griswold v. Homer City Council*, 310 P.3d 938, 941 (Alaska 2013).

remedy conduct or conditions that placed the child at risk of harm.[9] When, as here, the child is an Indian child, the superior court must find, by evidence beyond a reasonable doubt, that the child would likely suffer serious physical or emotional harm if the parent's custody were to continue.[10] The superior court made these findings in this case, basing them on the testimony and report of Dr. Glass. The superior court found Dr. Glass's testimony "quite credible" and noted that no expert testimony was presented that would call into question Dr. Glass's assessment and conclusions.

Grace argues that OCS did not present any evidence to support the superior court's finding that she had a mental illness that placed Ronnie at risk of harm.[11] But the report that Dr. Glass prepared for the termination trial described Grace's bizarre delusions and her heightened paranoia. Dr. Glass concluded that Grace would likely include Ronnie in her delusional process if she had more contact with him and that exposure to her delusions would require Ronnie to become her caretaker or to completely disengage from her. Dr. Glass thus concluded that Grace had the potential to cause Ronnie great physical or psychological harm or to expose him to such harm from others.

Grace also argues that the superior court erred in finding that she had not remedied the conditions that placed Ronnie at risk of harm. But Dr. Glass testified that Grace's mental condition over the course of the case had worsened rather than improved,

---

[9]     AS 47.10.088(a)(1) & (2).

[10]     25 U.S.C. § 1912(f) (2012).

[11]     AS 47.10.011(11) provides that "the court may find a child to be a child in need of aid" if "the parent . . . has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury[.]"

and the superior court found Dr. Glass's testimony credible. Grace does not address this aspect of Dr. Glass's testimony in her brief on appeal.

Grace also briefly argues that the superior court erred in finding that Ronnie would likely suffer serious emotional or physical damage if Grace's custody were to continue. The superior court based this finding on evidence that Ronnie was "very parentified" when he was living with Grace,[12] and on Dr. Glass's testimony that if Ronnie were returned to Grace, his parentification would recur and would be harmful to him, that Grace does not understand Ronnie's basic needs and would be incapable of meeting those needs, and that Ronnie would be harmed by having to determine which of Grace's behaviors were delusional and how to respond to her delusional behavior. Dr. Glass's report stated that Grace would "experience great difficulty safely and appropriately parenting *any* child." (Emphasis added).

In general, Grace argues that Dr. Glass's testimony should be discounted because Dr. Glass was unaware of progress she had made and the fact that she now had stable housing, and because Dr. Glass testified that Grace's delusions did not involve Ronnie. But Dr. Glass evaluated Grace only a few weeks before the termination trial, and the superior court noted that any progress Grace had made with Gustafson was a matter of treating symptoms rather than treating Grace's underlying delusional disorder. And although Dr. Glass acknowledged that Grace's recent delusions might not have directly involved Ronnie, these delusions had involved Ronnie when he was living with her, and they were a cause of Ronnie's removal from her home.

---

[12]    "[P]arentification in the family entails a functional and/or emotional role reversal in which the child sacrifices his or her own needs for attention, comfort, and guidance in order to accommodate and care for logistical or emotional needs of the parent." Nancy D. Chase, *Parentification*: *An Overview of Theory, Research, and Societal Issues, in* BURDENED CHILDREN: THEORY, RESEARCH AND TREATMENT OF PARENTIFICATION 3, 5 (Nancy D. Chase ed., 1999).

The superior court's findings on these issues appear to be adequately supported by Dr. Glass's testimony. We conclude therefore that the superior court's findings were not clear error.

**B.** **The Superior Court Did Not Err When It Determined That OCS Made Active Reunification Efforts.**

A superior court may not terminate parental rights to an Indian child unless it finds, by clear and convincing evidence, that OCS made reasonable and active efforts to provide services and programs designed to prevent the breakup of the Indian family.[13] The superior court made that finding here, noting that OCS's efforts included providing Grace with visitation, assessments, transportation assistance, referrals for counseling, contact with Grace's counselor, and meetings with OCS. Grace challenges this finding, arguing that her delusions persisted because OCS failed to implement Dr. Glass's recommendation that she be referred for a psychiatric evaluation.

The necessity for a psychiatric assessment was addressed by the superior court during hearings in January and February 2010. At the adjudication hearing on January 20, OCS requested a continuance, noting that Grace had refused to participate in a psychological evaluation or to discuss medication management with her OCS social worker. OCS asked the court to order Grace to participate in a psychological evaluation and to meet with a psychiatrist to discuss medication.

Grace initially objected to these requests. But later in the hearing, Grace agreed to work with Gustafson at Southcentral Foundation to set up a psychological evaluation and a psychiatric assessment. When the court convened on February 18, Grace reported that she had scheduled a psychiatric appointment with Dr. Tim Harvey at Southcentral Foundation the following week.

---

[13] 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

On February 23, 2010, Grace saw Dr. Harvey at Southcentral Foundation's Behavioral Services clinic, and his report indicated that Grace came for the evaluation because "OCS[ ]wanted [her] to see a psychiatrist regarding custody of [her] child." Grace denied having any psychiatric problems at the time, but Dr. Harvey was aware of her prior contact with Southcentral, her previous psychiatric intake, and her prior treatment "for putative delusional disorder versus paranoid schizophrenia." Dr. Harvey was also aware that Grace had "subtotally discontinued taking [prescribed] medication but ha[d] continued in interpersonal therapy here in the clinic for some time." Dr. Harvey was also aware of Grace's prior inpatient psychiatric hospitalization at Alaska Psychiatric Institute.

Grace made clear to Dr. Harvey that she believed she had "no need for medication intervention in terms of potential psychiatric illness at this time." Dr. Harvey concluded that although "[i]t appears that she has had significant symptoms consistent with a possible delusional disorder or possible other psychotic disorder including schizophrenia in the past" she "also makes it clear that she is not seeking medication treatment for any psychiatric disorders at the present time." Thus, Dr. Harvey indicated that he would "not schedule her for further follow[-]up at the present time" but he "did urge her to feel free to present once again to the clinic in the future should she have a desire for further evaluation or consideration of medication intervention for psychiatric issues."

When Dr. Glass interviewed Grace about two weeks later on March 10, 2010, and again on March 16, 2010, she apparently did not have Dr. Harvey's report from his February 23, 2010 evaluation. Her report indicated that she reviewed Southcentral records through May 28, 2009 and that updated records from Southcentral Foundation had been requested but "not received."

Thus, when Dr. Glass recommended that Grace be referred to a psychiatrist for a medication review, she was unaware that Grace had just had such a review. And Dr. Glass's assessment in her March 2010 report that Grace was "unlikely" to take medication to improve her ability to discern what is real from what is not was completely consistent with Grace's statement to Dr. Harvey that she was "not seeking medication treatment for any psychiatric disorders at the present time." We therefore conclude that, by the time of Dr. Glass's report, OCS had already provided active efforts to encourage Grace to obtain an appropriate medication review by a psychiatrist.

Grace also argues that OCS failed to provide active efforts because it failed to monitor or intervene in her therapy with Gustafson. But Grace's argument fails to acknowledge the social worker's testimony that OCS did keep in touch with Gustafson and monitor Grace's progress in therapy. More importantly, a review of Dr. Glass's testimony and reports suggests that Dr. Glass felt that Grace needed to be treated with kid gloves, and that any treating professional suggesting that she was delusional or required medication stood the chance of driving her away and destroying any chance for a beneficial, therapeutic relationship.

Dr. Glass's initial reports concluded that "Mr. Gustafson is likely the key to enlisting her cooperation in treatment but there is the chance that if he becomes involved in a push to get her on medication and become more involved with mental health treatment she will incorporate him into her delusional system and cut off the relationship." She also opined that "[m]ental health therapy would need to occur on a regular basis with the focus upon developing a more grounded perception, resolving underlying trauma, and addressing her delusional system." But Dr. Glass ultimately concluded that these efforts would be futile: "It is unlikely [Grace] will cooperate with this plan in any significant fashion, yet if she does not she is unlikely to be able to appropriately and safely parent her son."

-12- **6925**

The superior court concluded that OCS was not required to "have intervened in the counseling and re-directed Mr. Gustafson to ensure that counseling focused on the appropriate issues [relating to Grace's delusions]" because Gustafson

> "didn't think it was a priority and the department legitimately relied on his opinion of what is going on and his work with [Grace]. This was a counselor that was free for [Grace], easy to get to, and most importantly [Grace] trusted [Gustafson] and had worked with him for years. This was an important relationship for [Grace]. Dr. Glas[s] testified [Grace's] delusional issues are fixed and permanent, so ameliorating them so she can function well [in] a day to day environment may well be the best that can be done."

These conclusions appear to be well supported.

Based on this record, the superior court reasonably concluded that OCS made active efforts to preserve this family, even though these efforts ultimately proved unsuccessful.

**C.    The Superior Court Did Not Err When It Concluded That Termination of Grace's Parental Rights Was In Ronnie's Best Interests.**

Before a superior court may terminate parental rights it must also find that termination is in the best interests of the child.[14]  The superior court made that finding here, based on Ronnie's need for a permanent living situation and a permanent family.

Grace argues that the superior court did not adequately explore the option of a guardianship for Ronnie.  But the superior court explicitly rejected guardianship as a permanency option, stating that

> I gave serious thought to a guardianship approach.  Because that would allow ongoing contact between [Ronnie] and his mom.  But as the guardian ad litem pointed out, [Ronnie]

---

[14]    AS 47.10.088(c).

needs a permanent living situation. . . . He needs to be done with this, he needs to know what the plan is until he turns 18. And a guardianship would not provide that sense of permanency . . . it can be undone and . . . I don't think things are going to change with [Grace] significantly in the next five or six years.

The superior court's conclusion is consistent with our case law.

The law does not require the superior court to consider a guardianship in the context of a termination proceeding, except to the extent that the statute requires the court to consider the child's best interests.[15] The court may reasonably reject a request for guardianship if such a plan would be inconsistent with a child's need for stability and protection.[16] Here the superior court determined that Ronnie's best interests favor termination. This was a reasonable conclusion based on the record at trial.

Grace also argues that the superior court erred in finding that termination was in Ronnie's best interests because termination would not allow Grace to have ongoing contact with Ronnie, and that ongoing contact would be in Ronnie's best interests. As noted above, the superior court clearly considered this factor when it decided that termination was in Ronnie's best interests. But the court also noted: "It is very unfortunate . . . to me that the current law does not allow a judge to order termination but also order ongoing contact. I really wish I had that option, because I would certainly order it here, but I don't have that option."

We have previously stated that superior courts probably lack authority to order post-termination visitation by biological parents because the CINA statute does not

---

[15] *Thea G. v. State, Dep't of Health & Soc. Servs.*, 291 P.3d 957, 968 (Alaska 2013).

[16] *See Doug Y. v. State, Dep't of Health & Soc. Servs.*, 243 P.3d 217, 230 (Alaska 2010).

provide for the parents to retain any such residual rights.[17]  In that case, we relied on a decision interpreting the adoption statute, which reasoned that because the adoption statute did not mention post-adoption visitation, the statute foreclosed superior courts from issuing orders requiring post-adoption visitation.[18]  But we have also suggested that in cases involving "extraordinary circumstances" superior courts may have authority to order post-termination visitation to the extent that such contact will serve the child's best interests.[19]

In this case, Grace did not specifically ask the court to allow visitation following the termination of parental rights, so we do not consider that issue directly.[20] Indeed, the superior court explicitly considered the value of continuing contact between Grace and Ronnie as a factor weighing against termination.  But the court ultimately determined to order termination to promote Ronnie's needs for stability and protection. The superior court did not commit any clear error when it balanced these factors and reached its final conclusion that termination would be in Ronnie's best interests.

---

[17]    *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 57-58 (Alaska 2001).

[18]    *See id.* (citing *In re W.E.G.*, 710 P.2d 410, 415 (Alaska 1985)).  The adoption statute was subsequently amended to specifically allow for such "open adoptions." *See* AS 25.23.130(c).

[19]    *Burke P. v. State, Dep't of Health & Soc. Servs.*, 162 P.3d 1239, 1248 (Alaska 2007).

[20]    *See Hannah B. v. State, Dep't of Health & Soc. Servs.*, 289 P.3d 924, 935 (Alaska 2012) (declining to consider the question of whether a guardianship would be in a child's best interests because the issue was not raised at the termination trial).

**E.** **The Superior Court Properly Considered Grace's Claim Of Ineffective Assistance Of Counsel.**

Grace argues that her appointed attorney provided ineffective assistance of counsel.[21] She raised this issue in the superior court by making three requests for substitution of counsel. The superior court held a hearing on each request and denied Grace's motions.

The superior court also denied Grace's request to have another judge consider her challenges:

> [T]he fact that [Grace] makes allegations, the fact that she behaves the way she does has no bearing whatsoever on my rulings. . . . I'm going to rule on [the petition] based on the record I have at the trial. . . . It is a necessary part of a judge's life that they address people who want to replace their lawyers, and the judge who's the trial judge is in the best position to figure out what the problem is, because they [understand the] context.

On appeal, Grace argues broadly that to avoid an appearance of impropriety the superior court should have appointed another judge to hear her requests for substitution of counsel.[22] She argues that during the representation hearing she could "have revealed mental infirmities or said something that could negatively affect the trier of fact's view of her." But Grace does not cite any cases supporting this view or argue how the procedure in this case created an appearance of impropriety.

---

[21] *See V.F. v. State*, 666 P.2d 42, 45 (Alaska 1983) (holding that an indigent parent has a constitutional right to the effective assistance of counsel in a proceeding to terminate parental rights).

[22] Alaska Code of Judicial Conduct Canon 3(E)(1) provides that "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . . ."

In Alaska, a judge has an obligation not to order disqualification "when there is no occasion to do so."[23] Trial judges are often called upon to compartmentalize their decisions — to review evidence that is later declared to be inadmissible or to rule on similar legal issues at different stages of a contested case. Generally, these decisions do not create an appearance of impropriety unless the judge hears something or does something so prejudicial that further participation would be unfair to the parties.[24]

In this case, Grace not only fails to identify any legal error; she also fails to show any way that the consideration of her requests for substitution of counsel by the assigned judge affected the ultimate decision in this case. Thus Grace has failed to show any error that would require us to reverse the superior court's decision on her request for assignment of a different judge.[25] And Grace does not raise any other arguments regarding the superior court's decision denying her requests for substitution of counsel.

Grace also challenges several decisions by her trial counsel: she argues that her counsel failed to zealously assert that OCS did not make active efforts on her behalf,

---

[23]    *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979).

[24]    *See Lacher v. Lacher*, 993 P.2d 413, 420-21 (Alaska 1999) (judge who had been involved in one party's involuntary commitment proceedings not disqualified from presiding over divorce trial); *R.J.M. v. State*, *Dep't of Health & Soc. Servs.*, 946 P.2d 855, 869-70 (Alaska 1997) (judge who presided over parents' divorce trial not disqualified from later proceedings to terminate parental rights); *Cook v. State*, 36 P.3d 710, 728-29 (Alaska App. 2001) (judge who issued restraining order not disqualified from plea proceedings on related stalking charge); *see also State v. City of Anchorage*, 513 P.2d 1104, 1112 (Alaska 1973) (approving federal rule that "a judge may not be disqualified on the mere basis of previous rulings, opinions, or exercises of judicial discretion").

[25]    Alaska Civil Rule 61 provides in part: "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

failed to pursue the issue of guardianship, and failed to pursue the question of future contact between her and Ronnie. These decisions all appear to involve tactical considerations that are resistant to subsequent challenge.[26] But Grace did not present these arguments to the superior court, so we have no superior court order to review directly.[27] And the record contains no explanation of her attorney's decisions that would assist our review.[28] We conclude that the superior court did not commit plain error in its failure to recognize or resolve these challenges.[29]

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's order terminating Grace's parental rights to Ronnie.

---

[26] *Chloe O. v. State, Dep't of Health & Soc. Servs.*, 309 P.3d 850, 858-59 (Alaska 2013) (citation omitted).

[27] *See Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 384 (Alaska 2007) (declining to review an ineffective assistance of counsel claim that was not raised in the superior court).

[28] *See Nelson v. State*, 273 P.3d 608, 612 (Alaska 2012) (requiring a challenging party to present some evidence ruling out the possibility of a tactical reason explaining an attorney's conduct).

[29] *See Paula E. v. State, Dep't of Health & Soc. Servs.*, 276 P.3d 422, 436 (Alaska 2012) (reviewing for plain error an objection that was not raised in the superior court).

STOWERS, Justice, dissenting in part.

## Prologue

The Office of Children's Services retained psychologist Dr. Melinda Glass to evaluate Grace L.'s mental health problems and to make recommendations for what needed to be done to assist Grace in becoming a safe parent and regaining custody of her son. Dr. Glass recommended:

> If there were any hope of returning her son to her, ongoing oversight would be necessary, as well as . . . an evaluation for medication, and compliance with recommended medication and treatment. Mental health therapy would need to occur on a regular basis with the focus upon developing a more grounded perception, resolving underlying trauma, and addressing her delusional system.

## I.

This appeal involves the superior court's termination of a mother's parental rights to her Indian child. Thus this Child In Need of Aid case is governed by the Indian Child Welfare Act (ICWA).[1] Under ICWA, the superior court may not terminate a parent's parental rights to an Indian child unless it finds, by clear and convincing evidence, that the State made active efforts to provide services and programs designed to prevent the breakup of the Indian family.[2] ICWA section 1912(d) provides:

> Any party seeking to effect a . . . termination of parental rights to[] an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

---

[1]     25 U.S.C. §§ 1901-1923 (2012).

[2]     25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

"No 'pat formula' exists for distinguishing between active and passive efforts, and we have adopted a case-by-case approach for the active efforts analysis."[3] But we have repeatedly recognized that efforts are passive "where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition."[4] In contrast, efforts may be termed active when "the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own."[5] As an example, "rather than requiring that a client find a job [and] acquire new housing, . . . the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child."[6]

I disagree with the court's opinion concluding that the superior court did not err when it determined that the Office of Children's Services (OCS) made active reunification efforts. I conclude that OCS failed to make active efforts under a clear and convincing burden of proof. This being the case, I also conclude that the superior court's

---

[3] *Josh L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 276 P.3d 457, 466 (Alaska 2012) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011)).

[4] *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (quoting CRAIG J. DORSAY, THE INDIAN CHILD WELFARE ACT AND LAWS AFFECTING INDIAN JUVENILES MANUAL 157-58 (1984)); *see also Dale H. v. State, Dep't of Health & Soc. Servs.*, 235 P.3d 203, 213 (Alaska 2010); *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009); *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997).

[5] *A.A.*, 982 P.2d at 261 (quoting DORSAY, *supra* note 4, at 157-58).

[6] *Id.*

order terminating Grace's parental rights should be reversed and the case remanded for OCS to make the active efforts that ICWA requires.[7]

When OCS refers a parent with mental health problems like Grace to a mental health professional for an evaluation, it does so for a variety of reasons. One of

---

[7]    Because I conclude that OCS failed to make active efforts, I also necessarily conclude that it was error to find that Grace failed to timely remedy the conduct or conditions that made her son a child in need of aid. And because it is premature to find that termination of a parent's parental rights is in the best interest of the child where OCS fails to make active efforts, I disagree with this finding also. I concur with the court's opinion that the superior court's finding that Ronnie is a child in need of aid was not error, and that the superior court properly considered Grace's claim of ineffective assistance of counsel.

I also disagree to a point with the superior court's refusal to consider Grace's request for an order for post-termination visitation. The court explained: "It is very unfortunate . . . to me that the current law does not allow a judge to order termination but also order ongoing contact. I really wish I had that option, because I would certainly order it here, but I don't have that option." We stated in *Ralph H. v. State, Department of Health and Social Services, Office of Children's Services*:

> After a trial court terminates parental rights, the parent retains no residual parental rights to the child. Although there is no CINA statute that expressly grants the superior court the authority to order post-termination visitation, we have not foreclosed the possibility that the superior court could authorize post-termination visitation in "extraordinary circumstances." In such circumstances, post-termination visitation will only be permitted "to the extent that the authorized visitation is in the best interest of the child."

255 P.3d 1003, 1014 (Alaska 2011) (quoting *Burke P. v. State., Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1248 (Alaska 2007); *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 58 (Alaska 2001)) (footnote omitted). In my view, of all the cases where this court has considered the question of post-termination visitation, if a trial court may order such visitation (an unresolved legal question), this case would likely satisfy the criteria of "extraordinary circumstances."

the most important reasons is to gain an understanding of exactly what the parent's mental health problems are and what can be done to treat them. The mental health professional often will make critical recommendations for further assessment and treatment, and OCS will (or should) include these recommendations in the parent's case plan. Developing an appropriate case plan is crucial for the parent to know what she must do in order to maximize the possibility of reunifying with her child. Developing an appropriate case plan based on the recommendations is also crucial for OCS to demonstrate that it has made active efforts under ICWA.

In this case, OCS failed to comply with the recommendations of its retained mental health professionals — namely, to refer Grace to a psychiatrist for medication assessment and management of her delusional disorder, and to closely monitor her therapy to ensure that the therapist was actually providing therapy "with a focus upon . . . addressing her delusional system." Because OCS failed to make these efforts, in the words of Dr. Glass, Grace had no hope of having her son returned to her.

## II.

OCS took emergency custody of Ronnie on July 31, 2009. The following month, OCS referred Grace for an assessment with clinical psychologist Dr. Grace Long, who recommended that Grace continue in therapy and be evaluated by a psychiatrist to determine if medication would be appropriate for her.

On February 23, 2010, Grace was seen by Dr. Tim Harvey at Southcentral Foundation's Behavioral Services clinic. The court today places much emphasis on this visit with Dr. Harvey, relying on it to support its erroneous conclusion that OCS satisfied its active efforts obligation to make a referral to a psychiatrist for medication management. I therefore quote from Dr. Harvey's report in some detail and ask the reader to pay close attention to exactly what Dr. Harvey said. According to Dr. Harvey's

evaluation report, Grace explained that "OCS wanted me to see a psychiatrist regarding custody of my child." Dr. Harvey elaborated:

> The patient presents today for medication evaluation in the clinic for somewhat unclear reasons. . . .
>
> The patient is somewhat reticent to discuss her psychiatric history today and indicates that she feels that she has no psychiatric problems at the present time requiring treatment. . . . Once again she indicates that she is only presenting today somehow at the behest of OCS or others involved with the custody proceedings.

In his Clinical Summary, Dr. Harvey stated:

> This is a patient with an apparent history of delusional disorder versus possible schizophrenia who is presenting today apparently primarily for procedural reasons relating to an apparent custody case regarding her youngest child. The patient is currently in ongoing interpersonal therapy . . . but makes it clear that she feels no need for medication intervention in terms of potential psychiatric illness at this time.

In his Recommendations, Dr. Harvey wrote:

> I discussed with the patient [] that I do not do psychiatric evaluations for OCS or agencies other than [Southcentral Foundation] at the present time. I urged her to speak with her attorney or other representatives if she should have further questions about her custody case. It appears that she has significant symptoms consistent with a possible delusional disorder or possible other psychiatric disorder including schizophrenia in the past but does not present with complaints particularly consistent with this today. She also makes it clear that she is not seeking medication treatment for any psychiatric disorders at the present time.

Several things become immediately clear from Dr. Harvey's report. It is evident that OCS did not contact Dr. Harvey or provide him with any information about

Grace or the reason OCS wanted her to be evaluated by him. Had OCS done so, Dr. Harvey would certainly have referenced this collateral information, and he would not have been so reliant on his delusional patient's self-reporting or so uncertain about why she came to him. It is also significant that Dr. Harvey clearly stated that he does not "do psychiatric evaluations for OCS." It may be inferred that OCS told Grace to go see Dr. Harvey for a medication evaluation, though a mere referral would not have satisfied OCS's active efforts obligation. But under these circumstances, where Dr. Harvey had no clear idea what he was being asked to do, and where he was plainly not in the business of working on OCS matters, surely this referral, if a referral it was, cannot constitute clear and convincing evidence that OCS met its active efforts obligation to refer Grace for a psychiatric medication assessment.[8]

It is also highly significant that at the termination trial, OCS did not rely on Dr. Harvey's "assessment" to support its active efforts argument; indeed, OCS never mentioned Dr. Harvey by name during the termination proceedings. And while it is true that Dr. Harvey's report was included within numerous other Southcentral Foundation records for Grace which were collectively admitted as OCS's trial exhibit 4, no party referred to Dr. Harvey's report either at trial or in argument, and the superior court never mentioned, much less relied on, Dr. Harvey's report for any purpose in its oral and written findings and order terminating Grace's parental rights. In other words, while this court relies heavily on Dr. Harvey's report to save OCS from its obvious failure to follow Dr. Glass's urgent recommendation, neither the parties nor the trial court mentioned Dr. Harvey or his report at any stage of the proceedings below.

---

[8] For efforts to be active, "the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own." *A.A.*, 982 P.2d at 261 (quoting DORSAY, *supra* note 4, at 157-58).

In March 2010, after Grace visited Dr. Harvey, she participated in a psychological evaluation with Dr. Melinda H. Glass, to whom OCS had referred her. Dr. Glass interviewed Grace, administered a number of tests, and reviewed collateral information. Dr. Glass diagnosed Grace with "[d]elusional disorder, mixed type, primarily persecutory and grandiose." She noted that Grace started taking medication after completing a psychiatric assessment in 2008, but had stopped taking it within weeks. Dr. Glass concluded that without medication Grace "is likely to experience great difficulty safely and appropriately parenting any child . . . and is likely to be unable to provide [Ronnie] with guidance or stability." Dr. Glass then stated:

> If there were any hope of returning her son to her, ongoing oversight would be necessary, as well as ongoing in-home parenting services, an evaluation for medication, and compliance with recommended medication and treatment. Mental health therapy would need to occur on a regular basis with the focus upon developing a more grounded perception, resolving underlying trauma, and addressing her delusional system.[9]

Dr. Glass concluded, "[A]s long as [Grace] continues to function with an untreated delusional disorder she has the potential of causing great harm to her son as well as to herself."

Dr. Glass also stated that while it was important for Grace to receive mental health treatment if she were to have a safe and appropriate parenting relationship with Ronnie, her persecutory delusions would likely hinder her ability to participate in treatment. Dr. Glass noted that Grace appeared to have a good relationship with Grace's Southcentral Foundation therapist, Richard Gustafson, who "appears to understand some

---

[9]     These critical needs — ongoing oversight, psychiatric medication referral, and ongoing therapy focused on Grace's delusional disorder — are the areas where OCS utterly failed to make active efforts.

of her problems." Dr. Glass recommended that Grace continue in therapy and also be referred to a psychiatrist for a medication review and that she take any recommended medication to try to improve her ability to discern reality. Dr. Glass noted that Grace "is unlikely to do this without a court order, and may not even then."

But, having received this recommendation from the expert it retained, OCS failed to refer Grace to a psychiatrist for a medication evaluation.

On May 3, 2012, OCS asked Dr. Glass to conduct an updated psychological evaluation of Grace. Dr. Glass noted that "[t]reatment does not appear to be helping [Grace] address her mental illness and it is not known whether medication would have a significant impact. It is unlikely [Grace] would consider it as she has refused medication in the past." Dr. Glass concluded that "a psychiatric evaluation to rule out a mood disorder and consider the usefulness for medication *is still recommended*." (Emphasis added.) Yet again, OCS did not act on this recommendation.[10]

### III.

Compounding its failure to make a real referral to a psychiatrist for medication and treatment, OCS also failed to monitor to any significant degree Grace's progress in therapy.[11] Grace's Southcentral Foundation Behavioral Health therapist

---

[10]    If one were cynical, one might conclude that in asking Dr. Glass to conduct a follow-up assessment, OCS was more interested in generating evidence to support its petition to terminate Grace's parental rights than in making active efforts towards reunifying Grace with her son. OCS filed its petition to terminate Grace's parental rights on January 6, 2012. OCS had Dr. Glass reassess Grace on May 3. The termination trial commenced on May 21. It would be disingenuous for OCS to argue that this eleventh hour, follow-up assessment by Dr. Glass should count as an active effort; it would be error for the court to consider it an active effort.

[11]    Cynthia Robinson was the only OCS caseworker to testify at the termination trial. She stated that she was assigned to Grace's case on October 1, 2011.

(continued...)

Gustafson testified at the termination trial that he worked with Grace to enhance her ability to function in the world, but that he did not attempt to ameliorate her underlying delusions.[12] He was clear that his intent in therapy was to help Grace alleviate the anxiety she experienced as a result of her mental issues, *not* to address what Dr. Glass referred to as Grace's "delusional system." The trial court paraphrased Gustafson's goal to be "not so much [addressing] the cognitive element of identifying whether something is delusional or not but dealing with the sort of ramifications, the anxiety that flows from the perceptions she has and the behaviors that flow from the perception she has." Gustafson agreed with this summary. He admitted that "[he was] not sure what the criteria are[] exactly" for delusional disorder, and would "have to go with whatever the DSM says."

---

[11](...continued)
She was asked at trial whether she had been in contact with Gustafson since being assigned to the case, and she answered, "I did just briefly, not telephonically, but there was an email sent to me." She was not asked whether other caseworkers had any discussions or communications with Gustafson about his therapy sessions with Grace. Robinson answered "yes" when asked whether "the department over various times contacted him for updates." Presumably she was referring to OCS's obtaining copies of his notes of therapy sessions with Grace. There is nothing in the record to indicate that OCS and Gustafson were in direct contact or what the content of any communications may have been. Nor does the record disclose that OCS took any action in response to communications it may have received from Gustafson. What is absolutely clear is that OCS was unaware until Gustafson testified at the termination trial that he did not see that his role was to treat Grace's underlying delusional disorder; rather, he saw his role to be treating Grace's anxiety symptoms.

[12]     Although Gustafson's notes indicate that one of his objectives in treatment was to have Grace identify delusional situations and use behavioral techniques to prevent delusional anxiety, Gustafson explained that he did not attempt to challenge Grace's delusions. He also testified that most of the progress Grace had achieved through therapy had to do with her ability to control her hostility and agitation and to express herself in an appropriate manner.

Had OCS actively monitored, to any degree, Grace's treatment with Gustafson, it would have easily seen that his therapy did not have the recommended "focus upon . . . addressing her delusional system." But OCS and Gustafson had no meaningful contact before the termination trial.

## IV.

As noted earlier, a trial court may not terminate a parent's parental rights to an Indian child unless it finds, by clear and convincing evidence, that the State made active efforts to provide services and programs designed to prevent the breakup of the Indian family.[13] The trial court made that finding here, specifically explaining that OCS's efforts included providing Grace with visitation, assessments, transportation assistance, referrals for counseling, contact with Grace's counselor, and meetings with OCS. I disagree: OCS breached its duty to Grace by not referring her for a psychiatric/medication evaluation as Dr. Glass recommended, by not monitoring to any practical extent the kind of therapy Gustafson was providing, and by not referring Grace to a therapist who could provide the kind of therapy identified as necessary by Dr. Glass.

The trial court noted that while Gustafson's goal was not to eradicate Grace's underlying delusional disorder, counseling with Gustafson "was free for [Grace], easy to get to, and most importantly [Grace] trusted him and had worked with him for years. This was an important relationship for [Grace]." I agree with the trial court and with Dr. Glass that participating in counseling, particularly in counseling with Gustafson — with whom Grace had an established relationship — was important for Grace. But I also believe that OCS was required to do more to monitor her progress in counseling.[14]

---

[13] 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

[14] One of the efforts the trial court credited OCS with having made was "maintaining contact with a counselor on ongoing issues." My review of the record
(continued...)

Had OCS done so, it would have realized that Gustafson's objective was *not* to treat Grace's delusions but to help her function in spite of being delusional.[15] In failing to reset the focus of her treatment with Gustafson to ensure that Grace received the recommended counseling targeted at her delusional system or to refer Grace to another therapist who could focus therapy on Grace's underlying delusional disorder, OCS failed to make active efforts.

OCS referred Grace for three different evaluations: one mental health assessment with Dr. Long, and two psychological evaluations with Dr. Glass. Both Dr. Long and Dr. Glass specifically recommended that Grace receive an evaluation by a psychiatrist for medication management. As explained above, and contrary to the court's erroneous post facto justification, the assessment by Dr. Harvey at Southcentral

---

[14](...continued) indicates that such contact was minimal, as I previously demonstrated in note 11, and was certainly not acted on by OCS in any meaningful way. Had OCS actually engaged in monitoring Gustafson's counseling with Grace, it would have discovered long before the termination trial that Gustafson did not see his role as providing therapy focused on addressing Grace's delusions.

Indeed, the trial court seemed flabbergasted after Gustafson testified; the court was surprised that Gustafson had not been focusing on Grace's underlying delusions, and it commented that Gustafson "had nothing of use to say about her delusional disorder. At all." In colloquy with the Guardian ad Litem following the conclusion of Gustafson's testimony, the court stated, "I guess, Ms. Skoog-Moore, you'd identified that perhaps the counselor [Gustafson] could give us some sense on how deep-seated this disorder is, and I don't think — I really don't think he cares." Skoog-Moore replied, "I don't think he thinks he's qualified obviously to go into delusional. Is what I got out of [Gustafson's testimony]."

[15]     In her follow-up evaluation, Dr. Glass noted that, while Grace had continued in treatment with Gustafson, the treatment "does not appear to be causing an improvement in her functioning." Again, this is not surprising since Gustafson was treating Grace's anxiety symptoms and helping her cope with the effects of her delusional disorder, not treating the underlying disorder itself.

Foundation could not have counted as OCS's referral for psychiatric medication assessment and treatment if for no other reason than because Dr. Harvey stated that he did not do psychiatric assessments for OCS. And Dr. Glass could not have been clearer when she recommended, *after* Grace saw Dr. Harvey, "If there were any hope of returning her son to her, ongoing oversight would be necessary, as well as . . . an evaluation for medication." OCS ignored these recommendations.

This is not a case where I can conclude that OCS's efforts over the course of the entire case were active; here, OCS failed to make any real effort to address Grace's critical needs that were identified by the very mental health care experts that OCS selected to guide it in preparing a case plan to identify what efforts it needed to actively make. And this is not one of those cases where OCS can survive a serious active efforts challenge by pointing to the parent's co-failure to participate in her case plan. Here, Grace was complimented by Gustafson for making, or making up, every counseling session,[16] and OCS did not dispute that Grace satisfied the other elements of her case plan (housing and visitation with Ronnie).[17] Of course, Grace could not have satisfied the psychiatric medication part of her case plan because OCS failed to make that referral. And there was no testimony by any OCS caseworker that the worker spoke with Grace and urged her to obtain a psychiatric medication assessment or consider taking medication for her delusional disorder.

---

[16]    Gustafson testified that the "only reason she misses [a counseling session] actually is if I'm not there. And even in those cases, she'll . . . double up at some point." He went so far as to state, "I'd almost bet my money on if she missed it was because . . . I was gone for family leave."

[17]    Unrebutted testimony indicated that Grace had found stable housing in Eagle River, was attending all supervised visitation with Ronnie, and was consistently attending counseling with Gustafson.

For these reasons I would hold that the trial court erred in concluding under a clear and convincing evidentiary standard that OCS's actions toward Grace amounted to "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family."[18]  I would reverse the trial court's order terminating Grace's parental rights and remand so that OCS can make active efforts as recommended by Dr. Glass and required by the Indian Child Welfare Act.

---

[18]    25 U.S.C. § 1912(d) (2012).