NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BONNIE M., ) | |
| ) | Supreme Court No. S-16420 |
| Appellant, ) | |
| ) | Superior Court Nos. 3AN-14-00247 CN/ |
| v. ) | 3AN-15-00336 CN |
| ) | |
| STATE OF ALASKA, ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, ) | No. 1634 – June 7, 2017 |
| ) | |
| Appellee. ) | |
| _____ ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Callie Patton Kim, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Janell Hafner, Assistant Attorney General, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

I.      **INTRODUCTION**

A mother who struggles with substance abuse and mental health issues had her four-month-old daughter taken into emergency custody by the Office of Children's Services (OCS) after an alcohol-related incident in June 2014. Her one-year-old son was

---

\*      Entered under Alaska Appellate Rule 214.

living elsewhere and was not taken into OCS custody at the time. OCS worked with the mother over the course of nearly two years, coordinating with her probation officer and the mental health court, referring her for assessments and treatment programs, and arranging for family contact. The mother tried to engage in treatment and address her issues but was unsuccessful and repeatedly relapsed, even after completing one of the residential treatment programs. She was also repeatedly incarcerated and struggled with homelessness. One of the treatment facilities arranged for her son to be placed with her, and he was later taken into OCS custody when the mother decided to leave treatment. Ultimately, her parental rights were terminated.

The mother appeals, arguing that the superior court erred in finding that she failed to remedy the conduct that placed her children at risk within a reasonable time and in finding that terminating her parental rights was in the best interests of the children. Because the court's findings are well supported by evidence in the record, we affirm the order terminating parental rights.

## II.    FACTS & PROCEEDINGS

### A.    Facts

Bonnie M. and Steven G. are the parents of a son born in February 2013 and a daughter born in February 2014.[1] The children are Indian children under the Indian Child Welfare Act (ICWA).[2]

#### 1.    Bonnie's background

Bonnie had a traumatic childhood. She lived in a foster home where she was allegedly molested by her foster father for nine years. At the age of 13 she was institutionalized, and she spent years in psychiatric hospitals and residential behavioral

---

[1]    Pseudonyms have been used to protect the privacy of the parties.

[2]    25 U.S.C. § 1903(4) (2012).

treatment programs. She started drinking alcohol at the age of 12 and struggles with substance abuse. Bonnie has multiple mental health issues,[3] and she has repeatedly attempted to commit suicide, starting when she was seven years old. In an August 2015 behavioral health assessment she stated that "approximately '75% of her suicide attempts were alcohol-related.' "

Bonnie's substance abuse and mental health issues have contributed to legal, employment, financial, and personal difficulties. Bonnie has been repeatedly incarcerated and has been involved with the mental health court. She "has convictions for minor consuming alcohol, operating under the influence, violating conditions of release, child neglect, and assault." She has been charged for malicious destruction of property and has reported multiple charges for driving with her license revoked and shoplifting. She dropped out of college during her freshman year due to drinking and was discharged from the army for alcohol abuse. Since 2012 she has been unemployed and relied on food stamps and disability benefits. She has struggled with homelessness and abusive relationships.

### 2.     The children

In August 2011 Bonnie met Steven, and they were together for four years in a relationship that Bonnie described as involving domestic violence. Bonnie gave birth to their son in February 2013. She used alcohol during the pregnancy.[4] According

---

[3]     Her diagnoses include post-traumatic stress disorder (PTSD), manic depressive disorder, bipolar disorder, personality disorder, attention-deficit/hyperactivity disorder, bulimia nervosa, and depression. Bonnie has reported a diagnosis for fetal alcohol syndrome disorder. She also has a "history of self-harming by cutting."

[4]     During her pregnancy she received intensive outpatient services for substance abuse and mental health issues at Southcentral Foundation's Four Directions program from April 2012 until January 2013. She reported that she drank until passing
(continued...)

to an OCS report, Steven stated that he left Alaska in May 2013 in order to maintain sobriety; according to Bonnie, Steven used to sell methamphetamine and she smoked $1,100 worth of methamphetamine after he left her. In February 2014 Bonnie gave birth to their daughter, having used alcohol, methamphetamine, and cocaine during the pregnancy.

In March 2014 Bonnie was convicted of child neglect based on a January 5 incident, near the end of the pregnancy with her daughter; she was observed walking in the roadway while carrying her eleven-month-old son, so "vehicles had to stop or drive around" them. The child was not dressed for the cold. Bonnie appeared intoxicated and told police officers on the scene that she had been drinking.

According to Bonnie's mother Bonnie was arrested at some point after the birth of her daughter, and the two children were sent to live with an aunt in Kotzebue, where they stayed until June 2014. Bonnie's son subsequently went to live with Bonnie's brother in Kotzebue, and Bonnie's daughter returned to Anchorage, where she was cared for by Bonnie's mother.

On June 18, 2014, at around 1:20 a.m., the police responded to a report of a disturbance at Bonnie's mother's apartment. Officers found Bonnie, who was uncooperative and highly intoxicated, outside the apartment. Bonnie told the officers that she had had sexual relations with a soldier that evening and wanted to report a rape, but when questioned she became angry and walked away; she returned to tell the officers that she had nowhere to stay, but she refused to let them transport her to a safe place. She told the officers that her mother and infant daughter were inside the apartment and that a registered sex offender lived there as well. Bonnie's mother told the officers that

---

[4]    (...continued)
out when she was approximately 26 weeks along in her pregnancy and that her "longest time of sobriety on [her] own [was] 3-4 months."

she had been watching the infant and would not allow Bonnie to take her until Bonnie was sober.

Officers were called to the apartment again an hour and a half later based on reports of vandalism. Bonnie had returned and thrown a large beer bottle through the window of her mother's apartment; the bottle landed where the officers had previously seen Bonnie's mother and the infant sleeping.[5] The officers arrested Bonnie, who was still intoxicated, on charges of malicious destruction of property.

### 3. OCS involvement

Following the June 18 incident OCS took emergency custody of Bonnie's daughter on June 27. The emergency petition filed with the superior court the following day set forth the details of that incident. Bonnie's mother lived with her boyfriend, who both she and Bonnie knew was a registered sex offender. OCS's emergency petition suggested that Bonnie and her mother neglected the infant by failing to protect the infant from a sex offender. OCS also expressed concern about Bonnie's mother's "ability to provide appropriate supervision and care due to her disability."[6] The petition noted Bonnie's substance abuse issues and homelessness. It detailed the January 5 neglect incident involving Bonnie's son, when Bonnie carried him while drunk and walked in

---

[5] When Bonnie's parental rights were later terminated, the superior court incorrectly found that Bonnie threw a rock through the window, probably due to the guardian ad litem mistakenly identifying the object as a rock instead of a beer bottle during her closing statement. In the oral findings, the court correctly stated that "one of the children had been sleeping [there] with the grandmother," but the written findings, which incorporate those oral findings, include the erroneous statement that "the children had been sleeping [there] with their grandmother." These discrepancies are not material to our decision.

[6] This appears to be based on Bonnie's mother being legally blind and was mentioned at the end of a paragraph focusing on her ability to keep the infant safe while living with a sex offender.

the roadway. A probable cause hearing was held on June 30, and the record reflects that the daughter was found to be a child in need of aid. On July 30 the court granted OCS temporary custody of the daughter.

When the daughter was removed in June, OCS requested that the Kotzebue OCS office check on the safety of Bonnie's son. Because it was determined that the son was well cared for at his uncle's home, OCS did not take custody of him at the time.

During the first few months after the daughter was removed, Bonnie was incarcerated on and off. OCS began making referrals, discussed mental health services, and coordinated with Bonnie's probation officer regarding the services Bonnie was referred for by the mental health court. Part of the time, Bonnie was at New Life, which is a "transitional housing program for prisoner re-entry," and both New Life and the mental health court asked her to submit to periodic urinary analyses (UAs). OCS arranged weekly, supervised family contact, but Bonnie did not attend regularly, sometimes due to being incarcerated and sometimes because "she was not communicating or was late."

OCS referred Bonnie for a substance abuse assessment at Southcentral Foundation, which was completed on July 15, 2014. The assessor noted that Bonnie screened positive for a mental health referral but had already obtained a mental health assessment at PCC-1 West (Palmer Correctional Center) on July 2. During her Southcentral Foundation assessment Bonnie self-reported multiple mental health diagnoses and indicated that she was willing to resume taking her medications. She admitted that she was an alcoholic and needed help and "report[ed] her readiness to change to be a 10, due to losing her daughter and everything." Bonnie was diagnosed with alcohol dependence and cannabis and cocaine abuse. The assessor determined that Bonnie had a high potential for relapse without clinical interventions, noting that it appeared that she did "not have the skills or understanding to remain sober on her own"

and attributing her ability to remain sober at the time to "her living at the New Life Development Center and its structure." The assessor noted that Bonnie lacked sober social supports and had Anchorage Alcohol Safety Action Program (AASAP) involvement. "A level 2.1 Intensive Outpatient Treatment Program [was] recommended."

Over the next couple of months Bonnie received treatment through Southcentral Foundation's Four Directions program, where she "participated in Health Education class, Relapse Prevention groups, Early Recovery Skills groups, Family Education groups, Healthy Relationships/Seeking Safety groups as well as individual sessions." But her attendance was sporadic, and she used alcohol nearly daily, tested positive for substances, and stopped taking her psychotropic medications. Because she missed so many of her scheduled appointments and did not comply with requirements that she take her medications, her psychiatric provider eventually declined to see her unless she attended "three consecutive meetings with her behavioral health consultant." Bonnie became homeless during the program and lived in her storage unit. She was arrested for a probation violation on August 31 but was released ten days later, after her mental health court care coordinator arranged for her to live at the Ingra House. She resumed outpatient treatment on September 11 and told the mental health clinician that she was ready and had been given an opportunity to succeed and would not give up, but within a week she tested positive for substances. Bonnie was then incarcerated for the second time that month. On September 26 she was discharged from the Four Directions program, having made "none to poor progress" toward her treatment goals.

During that time OCS had developed a case plan. Under the case plan Bonnie was to participate in a substance abuse assessment through Southcentral Foundation's Four Directions or Dena A Coy programs and follow all recommendations and undergo treatment, if recommended, to "learn her triggers, develop healthy and sober

coping skills, develop a healthy and sober support system[,] and create a relapse prevention plan." The case plan incorporated the UAs Bonnie was required to undergo pursuant to the terms of her probation; she was also required to comply with her other probation requirements and to be involved with mental health court. The case plan further required her to participate in parenting and domestic violence classes and to receive therapy to address her past traumas, help her build a safe network, and help her develop a skill set to cope with her triggers.

On September 29 Bonnie entered residential treatment at Southcentral Foundation's Dena A Coy inpatient program, as a "bed-to-bed transfer from Hiland Mountain Correctional Center." At the beginning of the program, she underwent an alcohol and drug biopsychosocial update assessment as well as an integrated assessment. In the assessments Bonnie acknowledged that her alcohol use had caused legal issues, relationship problems, and the temporary loss of rights to her daughter, and she stated that "the more [she] lost the more [she] drank." She admitted that "she becomes violent when using alcohol and will frequently initiate fights." She reported that "[a]lcohol [was] also destroying [her] mom" but nevertheless identified her mother as one of her primary supports. In the integrated assessment, the assessor noted that Bonnie was at risk for suicide, lacked a sober support system, and was vulnerable to domestic violence and abusive relationships. The assessor determined that Bonnie was "unable to stay sober in an unstructured setting and [that] without treatment for co-occurring problems, she [was] at risk for . . . incarceration, permanent loss of [her] children, homelessness, physical harm, and mental health deterioration." The assessor noted that Bonnie had sought treatment multiple times but had not followed through with recommendations, and indicated that her prognosis was poor if she did not receive Level III.5 residential treatment for alcohol dependence, cocaine abuse, mood disorder, and PTSD. The assessor made a number of recommendations, including a psychiatric evaluation;

scheduled and random UAs; weekly individual mental health and substance abuse counseling; family counseling; life skills, parenting, and domestic violence groups; referrals for safe housing and vocational counseling; and care coordination with OCS, AASAP, and the mental health court.

The recommended psychiatric evaluation took place on October 7. The assessor noted Bonnie's significant trauma history, flashes of angry or impulsive behavior, and two incidents of blackout rage. The assessor suspected a borderline personality disorder but did not rule out the possibility that Bonnie was bipolar as well. Bonnie was diagnosed with alcohol dependence and "[m]ood disorder NOS [Not Otherwise Specified]," and a medication plan was put in place.

On October 9 Bonnie left the Dena A Coy program, but she regretted her "stupid decision" and called her case manager the following day about returning to the program and starting over. The clinical team decided to readmit her and Bonnie returned to the program on October 14. At some point before Thanksgiving Dena A Coy arranged for Bonnie's son to be placed with her. She also had the opportunity for weekly contact with her daughter, although sometimes Dena A Coy would not allow the contact when Bonnie failed to attend at least 90 percent of her groups.

In November Bonnie's daughter was adjudicated a child in need of aid. A disposition hearing was held in January 2015, and the court listed the reunification efforts that had been made, including offering substance abuse and mental health assessments, treatment, and counseling; offering domestic violence classes and counseling; offering transportation assistance; holding team decision making meetings; developing a case plan; and offering parenting classes and family contact. Although the court indicated that those efforts had been unsuccessful and that the daughter should not return to Bonnie's care at that point, the court noted that Bonnie "ha[d] made significant progress so far."

Bonnie completed treatment and graduated from Dena A Coy in February 2015, having received rehabilitation services for her alcohol dependence and cocaine abuse for 119 days and having tested negative for substances during treatment. Dena A Coy recommended a longer-term residential program because of Bonnie's "difficulty with mood regulation, keeping to structure[,] and staying on top of parenting responsibilities once her son was returned to her care." It was also noted that she struggled with time management, especially when caring for both children. Bonnie's biggest triggers for relapse were identified as "[u]nstructured time, loneliness[,] and feeling unloved." Bonnie indicated that she planned to continue taking her psychotropic medication, and she created a relapse prevention plan. The recommendations on discharge included mental health and medication management services as well as entering the Stepping Stones program once an opening became available.

OCS worked with Bonnie's probation officer, who "was able to fast track [Bonnie] into Stepping Stones." Before her March 2015 admission to the Stepping Stones program, Bonnie relapsed and used alcohol and methamphetamine. During the program she self-harmed and was unable to consistently self-administer her psychotropic medications and missed several doses. She was unable to fully engage in substance abuse treatment due to her "pattern of crisis-building, emotional instability, [and] inability to cope with distress or manage overwhelming feelings in a positive manner."

OCS arranged for family contact while Bonnie was in treatment at Dena A Coy and Stepping Stones. Either while in treatment there, or perhaps after being discharged, Bonnie frequently did not show up for family contact or cancelled at the last minute. She was also sporadic with her UAs, so OCS eventually cancelled them.

While in the Stepping Stones program Bonnie was incarcerated for 28 days in May 2015. On May 13 OCS petitioned for Bonnie's son to be adjudicated a child in need of aid. Effective June 3, OCS was granted temporary legal custody of the son, who

remained with his mother at the time.

In June 2015 Bonnie decided that she could no longer stay at Stepping Stones, so she contacted OCS and was discharged without completing the program. The discharge summary identified Bonnie's prognosis as resistant because of "lack of engagement in complying with the Stepping Stones program rules and guidelines." Level III.3 medium intensity or III.5 high intensity residential treatment was recommended. The discharge summary anticipated that Bonnie would face legal, financial, sober support system, parenting, and mental health challenges. It also noted that her environment, with family members and her significant other using substances, was not conducive to recovery and that she lacked transportation and stable housing and was inconsistent in attending the 12-Step program. OCS removed Bonnie's son when Bonnie left Stepping Stones against treatment advice, and he was placed in foster care with his sister.

OCS worked on finding a new treatment program for Bonnie after she decided to leave Stepping Stones and referred her to Jett Morgan for a substance abuse assessment, which she underwent in July 2015. In the assessment she reported having used alcohol two weeks earlier and cocaine a week and a half earlier. She was diagnosed with alcohol, cocaine, and amphetamine dependence. The assessor noted that Bonnie had gone through substance abuse treatment multiple times and consistently relapsed and was likely to continue using or relapse again unless she learned coping or relapse prevention skills. The assessor recommended "medically necessary level II.1, outpatient treatment services," group therapy, individual counseling, random UAs, and care coordination services.

Bonnie began treatment at Jett Morgan in August. She again admitted to struggling with substance abuse and indicated that she wanted to get her children back, become sober, get a job, and possibly take classes at Alaska Career College. However,

she continued to struggle, and the last group she attended was on November 4. Bonnie was discharged on December 1 without completing treatment.

Bonnie missed several UAs in September, October, and December 2015. On December 10 she was arrested and charged with burglary and assault after forcing her way into her former boyfriend's home and assaulting him; the police officers described her as "hysterically drunk and uncooperative." She was released from jail on December 30, and the following day she attempted suicide.

In January 2016 Bonnie had another encounter with the police when they responded to the hotel where she was staying and found that she had been involved in an altercation with her sister. Bonnie "had thrown a glass alcohol bottle at her sister's head[,] causing [the bottle] to shatter and lacerate her head." Bonnie appeared intoxicated and there were empty alcohol bottles and drug paraphernalia in the room. She was arrested and charged with assault with a dangerous instrument and violating the conditions of release.

While incarcerated Bonnie underwent a substance use disorder assessment in February. She reported having received outpatient mental health services through Southcentral Foundation until her January arrest but that she "used during intervention and stopped attending when she became incarcerated." She reported using alcohol on the day of her arrest, having used methamphetamine within a few days of her arrest, and "using up to 1 ½ 8 balls [of cocaine] on weekends." Bonnie indicated that she did well in a structured environment but was unable to maintain sobriety without intervention. Regarding her children, she described her relationship with her son as "strong, committed, and loving" but stated that she did not know her daughter. According to the assessment Bonnie had "[l]ittle recognition and understanding of substance use (and/or mental illness) relapse issues" and had poor skills for avoiding relapse.

While Bonnie was incarcerated, OCS petitioned for the termination of

Bonnie's and Steven's parental rights to the two children. Bonnie was released from custody on April 13.

## B. Proceedings

In May 2016 the superior court held a trial for the termination of parental rights for both children and for the adjudication of the son as a child in need of aid. Neither parent was present. The court issued an oral decision terminating both parents' parental rights in June, which was then incorporated into a written order issued in August.

With respect to Bonnie, both children were found to be in need of aid under AS 47.10.011(9) (neglect) and (10) (substance abuse). The court found that Bonnie had an ongoing and longstanding substance abuse problem that she had been unable to address and that her "ability . . . to parent ha[d] been substantially impaired by her addictive or habitual use of intoxicants." The court found that when drinking, Bonnie engaged in assaultive behaviors. It noted the incident where Bonnie threw a large beer bottle through a window and the bottle landed where Bonnie's mother and infant daughter had been sleeping, and concluded that "there ha[d] been a significant risk of harm to the children while she's been drinking and under the influence."

The court further found that Bonnie failed to remedy her conduct that placed the children at substantial risk of harm. It recognized that Bonnie tried to address her issues but simply was unsuccessful at doing so. It also recognized that Bonnie clearly loved her children but found that giving her additional time to address her issues was not appropriate because a great deal of time had passed already, no evidence showed that she was getting closer to addressing her issues, and the children needed stability.

The court found that "the children have special needs and require special

attention"[7] and that Bonnie was unable to provide even for their basic needs. The court noted that the children were young and needed stability and a parent who could be present for them as opposed to dealing with her own issues. It found that "continued custody of the children by either parent is likely to result in serious emotional or physical damage to the children."

The court found that timely, active, and reasonable efforts had been made to prevent the breakup of the family. It recognized efforts by OCS to work with Bonnie, including referrals for treatment, coordination with her probation officer, and development of a case plan. It noted that although there had been "some progress," Bonnie had not completed treatment and had been unable to address her substance abuse issues.

At the conclusion of the termination trial, the court found that Bonnie's son was a child in need of aid. And it concluded that terminating the parents' rights to both children was in the children's best interests.

Bonnie appeals.[8] She raises two issues on appeal: whether "the superior court err[ed] when it found [Bonnie] failed, within a reasonable time, to remedy the conduct that placed her children at risk" and whether "the superior court err[ed] when it found terminating [Bonnie's] parental rights to her two children was in their best interests."[9]

---

[7] Both children have special needs in the form of developmental delays. The son has physical aggression issues, and Infant Learning Program services were recommended for the daughter, who also has received speech therapy.

[8] The father has not appealed the termination of his parental rights.

[9] The Statement of Points on Appeal includes three additional issues, which appear to have been abandoned in Bonnie's brief. We will not consider these issues. *See*

(continued...)

## III. STANDARD OF REVIEW

A finding by the superior court that a parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk" must be based on clear and convincing evidence.[10] And the superior court must find "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[11] Both of these findings are factual findings, which we review for clear error.[12] "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[13] Generally, conflicting evidence is "insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's

---

[9]  (...continued)
*Smith v. State, Dep't of Transp. & Pub. Facilities*, 253 P.3d 1233, 1237 (Alaska 2011) (noting that "[f]ailure to argue a point [of law] constitutes an abandonment of it" and declining to address two claims that were included in the statement of points on appeal but not discussed in the brief (alterations in original) (quoting *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980))).

[10]  AS 47.10.088(a)(2)(B); CINA Rule 18(c)(1)(A)(ii).

[11]  CINA Rule 18(c)(3).

[12]  *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011) (first citing *Barbara P. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010); then citing *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 721 (Alaska 2003)).

[13]  *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

ruling."[14]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err When It Found That Bonnie Failed, Within A Reasonable Time, To Remedy The Conduct That Placed Her Children At Risk.

Under AS 47.10.088(a)(2) involuntary termination of parental rights requires a finding that

> the parent
>
>> (A) has not remedied the conduct or conditions in the home that placed the child at substantial risk of harm; or
>>
>> (B) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury . . . .

The statutory definition of a "reasonable time" is "a period of time that serves the best interests of the child, taking in[to] account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[15] In making this determination, the superior court "may consider any fact relating to the best interests of the child," including "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs."[16]

Bonnie argues that the superior court erred in finding that she failed to remedy her conduct or conditions within a reasonable time. She argues that she

---

[14] *Christina J.*, 254 P.3d at 1103 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

[15] AS 47.10.990(30).

[16] AS 47.10.088(b).

diligently worked at treatment during this case and did well in residential treatment at Dena A Coy. She admits to multiple relapses after that program but argues that "relapses must be expected" and that she nevertheless "has demonstrated her commitment to recovery and to her children." She also argues that further delay would not be detrimental to the children because they are not in a permanent placement and might be removed from their foster home to live with a different family in South Carolina.

None of these arguments show clear error in the superior court's finding that Bonnie failed, within a reasonable time, to remedy the conduct that placed her children in need of aid. As Bonnie herself recognized, her path to recovery has been "bumpy," with multiple relapses and unsuccessful treatment attempts. The court recognized that Bonnie had tried, and continued to try, but did not have success with her treatment and specifically found that "[n]o evidence was presented that [Bonnie] [was] getting closer to addressing her issues." This finding is abundantly supported by the record, which shows that Bonnie has received outpatient treatment through the Four Directions program, inpatient treatment at Dena A Coy, and inpatient treatment at Stepping Stones, but had only limited success and continued to relapse. By the time of the termination trial Bonnie's daughter was 27 months old and had been in OCS custody for 23 months; Bonnie's son was three years old and had been in OCS custody for nearly a year. The OCS caseworker testified that giving Bonnie more time would delay permanency for the children. Considering the "great deal of time" that had already passed and Bonnie's continued inability to address her issues, the court did not clearly err in finding that she failed to remedy her conduct within a reasonable time.

**B.** **The Superior Court Did Not Clearly Err When It Found That Terminating Bonnie's Parental Rights To Her Two Children Was In Their Best Interests.**

The best interests of the child must be considered in parental rights

termination proceedings.[17] Alaska Statute 47.10.088 indicates that the superior court "may consider any fact relating to the best interests of the child" and lists five specific examples:

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[18]

Bonnie argues that the court clearly erred in finding that terminating her parental rights was in the best interests of her children. She points to her OCS caseworker's testimony that Bonnie loved her children, that the family contact was positive, and that Bonnie had attempted treatment throughout the case. And she points to testimony by OCS's expert that Bonnie did "very, very well with [her children] and appear[ed] very bonded to them," that Bonnie appeared to "have some very good parenting skills when she's able to be with her kids and be following through on family contact," and that Bonnie "clearly love[d]" her children. Bonnie argues that she did well in treatment and has "expended great effort to become sober," and she repeats her argument that the children were not in a permanent placement.

The existence of some facts in favor of Bonnie does not show the superior court's decision to be clearly erroneous. As already discussed, Bonnie has not succeeded in remedying the conduct that placed the children in need of aid and has no prospect of

---

[17]     AS 47.10.088(c).

[18]     AS 47.10.088(b).

doing so in a timely manner. While Bonnie may be a good parent when she is not using alcohol or illegal drugs, she is not a safe parent when intoxicated. And the court found that Bonnie was unable to provide for the children's basic needs and that her children had special needs requiring special attention. It found that the children were young and needed stability and a parent who was present for them as opposed to dealing with her own issues.

As to the contention that the children were not in a permanent placement, while that can be a consideration, "lack of permanent placement will not necessarily be a decisive factor in deciding whether to terminate parental rights."[19] Additionally, the children's foster home was actually a potentially permanent home. And the foster mother testified that the children felt more secure and were bonded with her and her husband and called them mom and dad. OCS's expert testified that the children needed permanency and that they had made progress but that changing placements or returning the children to an unsafe caregiver would hinder that progress. At this point the daughter has been in OCS custody for most of her life, and the son has been in OCS custody for a significant portion of his life. Giving Bonnie more time, according to the OCS caseworker, would delay permanency for the children.

The superior court's finding that termination was in the children's best interests is well supported by the record. There are also facts in favor of Bonnie, but the court's analysis did take into account her love for her children and her efforts to address her issues. The record provides clear support for the superior court's finding, and "we

---

[19]     *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008); *cf. Judith R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 896, 902 (Alaska 2012) (finding no error in the superior court's best interests analysis where parental rights were terminated based on the mother's inability to be a "functional parent," without taking into account the fact that "no permanent placement had been identified for [the child] by the time of the trial").

will not reweigh evidence."[20]  In light of the record and the superior court's analysis, we conclude it was not clear error to find that terminating Bonnie's parental rights was in the best interests of the children.

## V.   CONCLUSION

We AFFIRM the superior court's decision terminating Bonnie's parental rights.

---

**20**     *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).